**Abraham FOSTER, III,
Plaintiff-Appellant,**

v.

**TANDY CORPORATION, t/a Radio
Shack, Defendant-Appellee.**

No. 86–1726.

United States Court of Appeals,
Fourth Circuit.

Argued June 4, 1987.

Decided Sept. 16, 1987.

Norris Carlton Ramsey, Baltimore, Md., for plaintiff-appellant.

James P. Gillece, Jr. (Vincent Candiello, Piper & Marbury, Baltimore, Md., on brief), for defendant-appellee.

Before HALL, Circuit Judge, MICHAEL, United States District Judge for the Western District of Virginia, and MacKENZIE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

MICHAEL, District Judge:

This case presents an appeal by Abraham Foster, III, (hereinafter Foster) against the Tandy Corporation (hereinafter Tandy) from a judgment from the court below granting judgment *non obstante veredicto* in favor of Tandy as against the verdict which appellant had obtained from the jury in the trial of the case.

The case below charged Tandy, the former employer of Foster, with violating 42 U.S.C. § 1981 (1982) and with various pendent state law violations for breach of contract and misrepresentation.

Jurisdiction for the appeal is established by 28 U.S.C. § 1291.

*Facts*

Foster, a black individual, was employed by Tandy on October 24, 1981, as a retail sales clerk in the store operated by Tandy in Catonsville, Maryland. After being hired, Tandy supplied to Foster an employee handbook, the significant parts of which are contained below:

[The] [f]ollowing examples of conduct may result in disciplinary action, ranging from a verbal to written reprimand or immediate discharge, depending upon the seriousness of the incident and extent of prior offenses, whether the same type or not:

1. Failing to follow prescribed work procedures.

2. Failing to maintain satisfactory levels of work performance or attendance standards.

. . . .

It is the corporation's desire to allow employees every opportunity for improving levels of performance, before it becomes necessary to consider termination action. The disciplinary steps that *may be utilized* are shown below:

1. Verbal Warning— . . .

2. First Written Warning— . . .

3. Second Written Warning— . . .

4. Employee will be subject to discharge action after or during any of the above steps if no improvement is displayed.

(Emphasis Added.) Of some significance to the case, the handbook specifically disclaimed any contractual intent and negated any justifiable reliance by the employees by providing that:

The policies stated herein are subject to change without notice at the discretion of the corporation.

Further, the handbook contained a general statement of equal employment opportunity.

Following his initial employment, Foster received several changes of status which appear to represent promotions, as evidenced by the fact that he was promoted from retail clerk to manager-trainee, later was assigned to manage the Catonsville retail store where he was first employed, and later still, was transferred to a computer marketing representative (hereinafter CMR) program. Mr. Dennis Adelson, the Baltimore area district manager, approved each of the changes in status enumerated above.

Once Foster had been transferred to a CMR status, he was assigned to the Computer Center operated by the appellee in Catonsville, where he worked under the supervision of Wencil Stanek. After Foster's assignment as a CMR in Catonsville he received formal training in that occupation, which was in addition to the earlier computer training he had received.

Evidence clearly discloses, primarily through the testimony of Stanek, that there are distinct differences between managing a retail store and selling computers. The retail store customers basically are drawn in by the advertising program and were often "walk-ins", whereas the computer sales by the CMR are principally made through what are called "cold calls" or "direct marketing". While no CMRs were required to demonstrate particular levels of sales during the first ninety days, Foster explained that all CMRs were expected after that period to achieve at least $15,000 in sales each month. In Foster's case, his sales started low and then began to climb and peaked at $15,516 in August. As a result of that performance, Stanek gave to Foster an individual award which Stanek himself purchased.

Thereafter, Foster's sales achieved an almost spectacular drop, drifting downward in September to $7,218, in October to $7,141, and in November to $6,808, all far below the expected $15,000 per month sales. Stanek talked with Foster on several occasions, trying to determine the reason underlying the low sale figures and to assist in any way that he could in bringing Foster's sales along. At the end of September, he gave to Foster a written performance evaluation showing him as a "7," by which Stanek meant "must improve," in product knowledge, in prospecting, and in setting goals which he could achieve. On the ten other categories he gave Foster a satisfactory rating.

When the October sales figure turned out to be worse than September's, Stanek met with Foster and told him that he must make the sales goal for November or he might be subject to termination. On that occasion, Foster gave assurances to Stanek that he believed he could meet the goals. This information was relayed to the district manager, Adelson, with Stanek indicating that he had placed Foster on thirty-days notice for the month of November, though Stanek at no time gave to Foster a written warning of any sort. Stanek testified that he felt that such a written warning was not mandated by the provisions of the employee handbook.

Testimony elicited at trial indicated that it was not the practice in Adelson's district to issue such written warnings; rather, Adelson expected managers to discuss performance problems with their subordinates and to keep him advised of such discussions.

During November, Foster's efforts did not produce favorable results. Stanek indicated he saw almost no effort by Foster to create sales and finally, based on Foster's poor November sales results, Stanek got in touch with Adelson and recommended that Foster be terminated.

Acting on this information, Adelson went to the Catonsville Computer Center on December 7, 1983, and spoke with Foster, asking Foster to explain why he had not met his November sales goal. Foster's answer was that he had been working on some things but they didn't come through. Adelson then asked Foster for his November and December marketing plans and the number of cold calls made by Foster. In both instances, Foster stated that those plans and tracking records were at home. Adelson then requested Foster to go home and get these records and bring them back so that he could inspect them. Foster's response was that he would get them, "if he could find them." This led Adelson to believe that Foster was not being honest with him, and he so stated this to Foster. Foster responded by stating that if Mr. Adelson didn't believe him, Foster could not convince him otherwise. Adelson then terminated Foster's employment for poor sales performance.

Following Foster's discharge on December 7, 1983, Foster filed suit on May 9, 1984, claiming: (1) a violation of 42 U.S.C. § 1981, asserting that Tandy terminated

his employment because he was black, (2) a fraudulent misrepresentation, charging that in its employment handbook Tandy promised him that employment opportunities would be made available to him without regard to race, and (3) a breach of employment contract, asserting that Tandy terminated him without cause or without following its normal progressive disciplinary procedure.

After various pre-trial motions, a jury trial ensued, where Foster blamed most of his problems as a CMR on Stanek because Stanek was out of the office during much of October and November which placed an additional burden on Foster, and Stanek failed to give Foster the assistance in computer sales that Foster needed. Foster also introduced three exhibits, comprised of statistical evidence which Foster contended showed racial discrimination in Tandy's employment practices. Those exhibits showed that Tandy had had 59 retail store managers between 1981 and 1983, including Foster, and only 3 of these were black. A second exhibit showed that there had been 35 CMRs employed in this same period, including Foster, and only 3 were black. A further exhibit showed that Tandy had terminated 22 CMRs in this period, including all 3 blacks.

Testimony at trial indicated that 2 other CMR employees in Stanek's stores had declining sales records, and both had voluntarily quit Tandy. There was no other evidence introduced as to other CMRs who had declining sales records and did not quit or were not fired.

At the close of Foster's evidence, Tandy moved for a directed verdict on all counts and the court granted the motion as to the contract and misrepresentation claims based on the general equal opportunity statement in the employee handbook. The court allowed the jury to consider claims based on the handbook's four-step procedure, however. After submission to the jury, a verdict was returned in Foster's favor awarding $34,092.84 on the three claims for compensatory damages and $75,000 on the 42 U.S.C. § 1981 claim for punitive damages. Thereafter Tandy filed a motion for judgment notwithstanding the verdict (n.o.v.) as to all claims and the district court granted that motion. The court based its grant of judgment n.o.v. on its findings that: (1) Foster had not proved intentional racial discrimination, principally because Foster presented no evidence that anyone in a position comparable to his was given more favorable treatment, (2) that the breach of employment contract claim did not rise to the proper level, because of the permissive nature of the contract's provision, and because of Foster's failure to prove Tandy's adherence to such provisions in any other case, and, (3) that Foster's purported evidence supporting the misrepresentation claim failed to prove any misrepresentation, any reliance, or any damage that Foster suffered as a consequence of any alleged misrepresentation.

Foster's appeal to this court is confined to the Order granting Tandy's motion for a judgment n.o.v.

*Foster's Appeal of the Judgment Notwithstanding the Verdict*

In ruling on a motion for judgment notwithstanding the verdict, the trial court must consider the record as a whole and view that record in the light most favorable to the non-movant. If, after reviewing the evidence as a whole and viewing it in the light most favorable to the non-movant, and without weighing the credibility of the witnesses, the reviewing court finds that there can be but one reasonable conclusion as to the verdict, adverse to the non-movant, the motion for judgment n.o.v. should be granted. *See, Brady v. Southern Ry.,* 320 U.S. 476, 479, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943); *Howard v. McCrory Corp.,* 601 F.2d 133, 137 (4th Cir.1979).

In *Lovelace v. Sherwin-Williams, Co.,* 681 F.2d 230, 241–42 (4th Cir.1982), this court set out, in the context of a claim for age discrimination, the standard the appellate court should apply in determining whether to overrule a judgment n.o.v. This court recognized the unusual danger involved in a discrimination claim, where motives for termination may be shown on a non-racial basis, though the evidence may adduce a mixture of racially discriminatory

motives. In an employment discrimination claim, causation is dispositive, yet generally incapable of direct proof. Previous courts have applied a number of differently stated tests to determine whether discrimination was the essential ingredient underlying an employee's termination. To guard against the danger that the jury will reach a decision on the basis of mere speculation, in light of the demonstrated difficulty in choosing rationally between "mere possibility" and "substantial probability", by impermissible but understandable resort to such factors as sympathy, the *Lovelace* court held that "the burden of producing rationally probative evidence—and the corresponding risk of nonproduction—is placed upon the claimants and subjected to the ultimate jury control devices of directed verdict and judgment n.o.v." *Lovelace*, 681 F.2d at 242. Consequently, only evidence which shows the "probability" and not mere "possibility" of discriminatory motivation will allow jury consideration. More simply stated, the inference of discrimination on the part of the defendant in a racial discrimination case which the jury draws must be "reasonably" probable under the facts shown.

■ A plaintiff may prove a claim under 48 U.S.C. § 1981 by direct evidence of intentional discrimination, which may be proven by statements made by the employer or its agents which evidence such intent. *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 714 n. 3, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983); *Moore v. City of Charlotte, North Carolina*, 754 F.2d 1100, 1105 (4th Cir. 1985). Alternatively, the plaintiff may prove discriminatory intent through circumstantial evidence which shows that the plaintiff was treated "less favorably than others because of race." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). In other words, the plaintiff, in this latter situation, must show disparate treatment. *See, Holmes v. Bevilacqua*, 794 F.2d 142, 146 (4th Cir.1986). In the alternative method of proof, the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36

L.Ed.2d 668 (1973), test bears on the question. That is, the plaintiff must initially establish a prima facie case of discrimination, which the defendant must explain with a legitimate non-discriminatory reason for the actions, with the burden of going forward then shifting back to the plaintiff to demonstrate that such reasons are actually pretextual. The plaintiff may prove a prima facie case in certain ways: he may show that he was qualified for the job and was replaced by another similarly or less well-qualified than himself, or he may show that others of a different race shared his lack of qualifications and were not disciplined as severely by the employer. *See*, B.L. Schlei and P. Grossman, *Employment Discrimination Law*, (2d ed. 1983), p. 596.

### A. Foster's Employment Discrimination Claim

The district court properly found that there was no evidence to demonstrate directly an intentional discrimination by Tandy. Though Foster's brief asserts that he did present direct evidence of discrimination, he fails to indicate any such testimony in the record. Certainly, those statements of Adelson and Stanek quoted in the record do not reveal direct evidence of discrimination; rather, they deal specifically with the matter of Foster's declining sales performance.

Failing in his effort to prove intentional discrimination, Foster makes a stronger attempt to show circumstantial evidence which will justify a conclusion as to racial discrimination. He does this primarily through the use of statistical tables that indicate a relatively small proportion of blacks employed by Tandy in CMR positions. In essence, that is all his statistics show.

Mr. Foster asserts that the district court erred in allowing the defendant's judgment n.o.v. in light of the statistical tables he introduced. The district court, in granting the judgment n.o.v., found that the statistical evidence did not rise to the level of proof needed to sustain Mr. Foster's allegation of Tandy's discriminatory practice. At the outset, we note that the trial court's

determination of what weight and sufficiency to accord Foster's statistical evidence was "undoubtedly factual," *Trout v. Lehman,* 702 F.2d 1094 (D.C.Cir.1985), and thus subject to reversal only for clear error. *Allen v. Prince George's County,* 737 F.2d 1299, 1303 (4th Cir.1984).

"Plaintiffs must demonstrate to the court's satisfaction that their statistical comparisons are meaningful," *Trout,* 702 F.2d at 1101, although such statistical analysis need not be perfect. *Allen,* 737 F.2d at 1304. The district court, justifiably, was unconvinced that Mr. Foster's proffered statistical analysis showed any discriminatory employment practice by Tandy, and we find no error in that decision.

This court continues to recognize the importance of statistical evidence in employment discrimination cases, where plaintiffs can rarely prove racial discrimination by direct evidence. Statistics may assist the trial court in determining whether an employer's action in a particular case conformed to a general pattern of discrimination. *Warren v. Halstead Industries,* 802 F.2d 746, 753 (4th Cir.1986). As this court has stated:

> Although statistics cannot alone prove the existence of a pattern or practice of discrimination or even establish a prima facie case shifting to the employer the burden of rebutting the inference raised by the figures, "statistical analysis served and will continue to serve an important role in cases in which the existence of discrimination is disputed." *Warren,* 862 F.2d at 758, quoting from *Teamsters v. United States,* 431 U.S. 324, 339 [97 S.Ct. 1843, 1856, 52 L.Ed.2d 396] (1977).

However, raw statistics devoid of any context which relates those statistics to the alleged discriminatory practice are of minimal probative value.

■ In this case, the only statistics introduced by Foster were exhibits that showed that Tandy had 59 retail store managers between 1981 and 1983, including Foster, and only 3 of these were black. Further, the statistics illustrated that there had

been 35 CMRs employed in this same period, including Foster, and only 3 were black. The statistics revealed that Tandy had terminated 22 CMRs in this period, including all 3 blacks. Relying on these figures, Foster asserts that Tandy engaged in an ongoing discriminatory employment practice. Foster's inference is not justified, however. With regard to the initial employment statistics, Foster failed to describe the pool of qualified black applicants from which Tandy could have hired. Without this frame of reference, it is impossible to determine whether the 3 to 56 ratio is exemplary or execrable.

Likewise, the termination statistics cited by Foster are uninformative. Foster failed to show that any non-minority employee in a comparable position and with a comparable performance record enjoyed preferential treatment by Tandy. Indeed, there is no evidence in the record which shows that a non-minority CMR with a declining sales performance was either kept on by Tandy, or let go after a more detailed procedure following the employee handbook's four-step procedure.

Foster contends that there is a showing of general unfavorable treatment of blacks by virtue of his statistical tables, yet there is no showing of any sort or nature indicating what the available pool of blacks may have been for employment in the various levels of employment by Tandy. He argues that the *McDonnell Douglas* standard should not be used in this case because he has made out a history of racial discrimination on the part of Tandy, principally relying on his statistical data. Certainly, that data shows that Tandy has hired more whites than blacks, and has fired blacks in the CMR positions. However, it does not address the critical issue of showing just how he, or any other minority, received disparate treatment.

In short, Foster's statistical comparison does not rise to the level of "meaningful" evidence which would support a claim of racial discrimination in Tandy's employment practices. The statistical evidence supplied by Foster, standing alone, is of little or no value, principally because there

is no attempt made by Foster to show the proportion of minorities in the applicant pool, the proportion considered and accepted for promotion, and the proportion of Tandy employees with comparable positions and sales performance to Foster that were retained by Tandy, all of which would have a very direct bearing on the hiring practices of Tandy. *See, McKenzie v. Sawyer*, 684 F.2d 62, 71 (D.C.Cir.1982).

Foster further complains of the "subjective criteria" embraced in the numerical rating system for the ninety-day evaluations. If Foster had already made out the prima facie case of discrimination, then a tenuous argument might be constructed on this point, but, as already indicated, he has not made out that prima facie case. *See, Page v. Bolger*, 645 F.2d 227, 230 (4th Cir.), *cert. denied*, 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981).

## B. *Foster's Contract Claims*

[3] As an additional point of complaint, Foster challenges the action of the trial court in granting the judgment n.o.v. on the breach of contract claim. Before trial, a motion for summary judgment on this claim had been filed by Tandy, advancing the argument that the verb "may" gave discretion to the company about invoking the four-step procedure. At the time of that motion, the case was assigned to Judge Young, who denied the motion stating that the use of the word "may" rather than "will" creates a double standard and does not give the employer freedom to choose to rely upon or to refuse to follow certain corporate policies at will.

After hearing all the evidence in the case, with the illumination that such evidence provides, as contrasted to matters before the court on a pre-trial motion, Judge Motz, the trial judge, stated that,

even if it is assumed that such a non-mandatory statement can confer a contractual right upon an employee, the most that the statement could mean is that, in accordance with the terms implied by law in every contract, the employer will act in good faith in deciding whether or not to apply the four step procedure. Thus in order to establish a

breach of a permissive contract term an employee who has been discharged without being given benefit of the four-step procedure must demonstrate that the employer acted arbitrarily and, specifically, that similarly situated employees were discharged only after the four step procedure was utilized. In this case plaintiff produced no proof.

Foster's argument is essentially based on a very narrow reading of the doctrine of the "law of the case." In a footnote in the case of *Hill v. BASF Wyandotte Corp.*, 696 F.2d 287 (4th Cir.1982), this court expressed reluctance to apply the law of the case doctrine in any mandatory fashion. Particularly is this so where the law of the case is drawn from a pre-trial ruling of a separate judge in the same district in the same case. As was stated in *Parmelee Transportation Co. v. Keeshin*, 292 F.2d 794, 797 (7th Cir.), *cert. denied*, 368 U.S. 944, 82 S.Ct. 376, 7 L.Ed.2d 401 (1961), "We cannot be expected to reverse a correct decision by one district judge simply because we find that it is contrary to a prior ruling by another district judge in the same case, i.e., contrary to the 'law of the case'." This is particularly true where the previous ruling has been on pre-trial motion, and the subsequent ruling comes after the full development of the case. Accordingly, Foster's argument based on "the law of the case" fails.

The handbook clearly states that the procedure "may be utilized." Such language is not ambiguous language. The usual meaning of the verb "may" is "possible, probable, or contingent," as opposed to "definite or certain." *See, e.g., United States v. Lexington Mill & Elevator Co. of Missouri*, 232 U.S. 399, 411, 34 S.Ct. 337, 340, 58 L.Ed. 658 (1914). Tandy, in rebutting this argument, quotes the controlling law of Maryland as set out in *Staggs v. Blue Cross of Maryland*, 61 Md.App. 381, 486 A.2d 798, 804 (1985), where the court emphasized that not all statements in personnel handbooks are enforceable contracts. Tandy also cites *Castiglione v. The Johns Hopkins Hospital*, 69 Md.App. 325, 517 A.2d 786 (1986), as authority for the proposition that an express disclaimer which allows the policies to be changed at

the discretion of the employer is effective to negate contractual liability.

Further, and of greater importance in relation to this matter, careful review of the joint appendix demonstrates beyond cavil that Foster failed to show that similarly situated employees were treated to the four-step procedure before being discharged. Further, the evidence amply demonstrates that Foster has not established the misrepresentation claim which he asserts as a further challenge to the judgment n.o.v. Certainly, Foster cannot be found to have relied on the disciplinary procedure set out in the handbook in accepting employment with Tandy because Foster did not receive the handbook until after he had accepted employment.

In passing, it should be noted that in that same joint appendix there were no showings by Foster of any damages directly stemming from any alleged misrepresentation. Foster did not show that he rejected other job opportunities to go to work for Tandy, relying on the assertions of the handbook, and further failed to show that Tandy either knew or thought the representations in the handbook were false or that Tandy intended through these misrepresentations to defraud Foster.

As a final point, Foster attempts in his brief to challenge the action of the district court in granting the motion of Tandy for a directed verdict on the claim that Tandy breached its contract and misrepresented its status as an equal opportunity employer. Dispositive to this claim is the fact that the notice of appeal filed by Foster addressed only the granting of the judgment n.o.v. motion, and did not set out as a basis for appeal the granting of Tandy's motion for a directed verdict. "Since the jurisdiction of the appellate court is determined by the timeliness and specific terms of the notice, it cannot be modified to cover a judgment not included by any reasonable interpretation." *See, e.g., Gunther v. E. I. duPont deNemours & Co.*, 255 F.2d 710, 717–18 (4th Cir.1958). This, of course, comports with the Federal Rule of Appellate Procedure 3(c) which states that "the notice of appeal shall specify the party or parties taking the appeal, shall designate the judgment, order, or part thereof appealed

from...." The grant of a directed verdict cannot be challenged on appeal under the terms of the notice of appeal in this case.

For the reasons set out herein, the judgment of the court below in granting a judgment *non obstante verdicto* is

AFFIRMED.