Chandler Nelson HUGHES,
Plaintiff–Appellant,

v.

HALIFAX COUNTY SCHOOL BOARD; James Gregory; Herbert Lloyd; Julian Harrison, Defendants–Appellees,

and

Tommy Lacks, Defendant.

No. 87–2641.

United States Court of Appeals,
Fourth Circuit.

Argued June 7, 1988.

Decided Aug. 26, 1988.

Mark Sheridan Brennan (Stephen W. Bricker, Bremner, Baber & Janus, Richmond, Va., on brief), for plaintiff-appellant.

Dennis Patrick Lacy, Jr. (Lacy & Mehfoud, P.C., Richmond, Va., Don P. Bagwell, Sr., Bagwell, Bagwell & Bagwell, Halifax, Va., on brief), for defendants-appellees.

Before POWELL, Associate Justice (retired), United States Supreme Court, sitting by designation, and ERVIN and WILKINSON, Circuit Judges.

ERVIN, Circuit Judge:

Appellant, Chandler Nelson Hughes, challenges the propriety of the district court's actions in granting directed verdicts or judgments notwithstanding the verdict in favor of the appellees on his § 1983 claims.[1] Finding no error below, we affirm.

## I.

This case began on August 8, 1984, when Hughes and three co-workers were sent to Turbeville Elementary School to dig a foundation for a building. The men worked for the maintenance department of the Halifax County School Board. After their lunch break, two of Hughes' three co-workers (Lloyd and Gregory) began to tease him about his participation in a grand jury investigation of the school board and thefts suffered by the maintenance department in particular. The taunts escalated and Gregory said "Let's hang him for it." Gregory and Lloyd then got a rope from the truck and went through a mock hanging of Hughes. Hughes was not amused.

When the group returned to the maintenance office, Hughes told the supervisor, Julian Harrison, of the incident. Hughes told Harrison that the mock hanging was in retaliation for his talking to the grand jury.[2]

The next day Harrison talked to Lloyd and Gregory, who told stories that differed with that told by Hughes. Harrison also talked to Lacks, the third co-worker who witnessed the ordeal. Lacks thought everyone was joking. JA 328–33.

On August 9, Harrison met with Dr. Jones, the Superintendent. Jones had been appointed to his post some six weeks earlier when his predecessor resigned under fire. He did not know any of the men involved in the incident. Jones told Harrison to discharge Lloyd, Hughes and Gregory. Hughes was told that he could appeal his discharge to Jones. Hughes never appealed; he filed suit.

Hughes brought suit against Gregory, Lloyd, Harrison, and the school board. He argued that he was discharged because of

---

1. This is not the first time that this case has been before us. On September 24, 1986, Hughes filed a motion in the district court seeking entry of judgment upon the court's order of August 12, 1986, which denied him relief on the § 1983 claim. The district court refused to enter a separate judgment. On July 22, 1987, this court reversed and remanded the case for entry of final judgment in accordance with Rule 58 of the Federal Rules of Civil Procedure. *Hughes v. Halifax County School Board,* 823 F.2d 832 (4th Cir.1987). The district court then entered final judgment on August 18, 1987, and Hughes filed a timely appeal.

2. Rampant school board corruption received much publicity in this area. The investigation also led to some strained relations between employees, and Harrison was asked by the local prosecutor not to talk about the issue with his subordinates.

his race and in retaliation for his cooperation with the grand jury investigation into misdeeds by the school board. He filed a ten count complaint alleging violations of Title VII, § 1985, § 1983, § 1981, and several pendent state law claims. Hughes voluntarily withdrew four of his claims and suffered directed verdicts or judgments notwithstanding the verdicts on several other claims.[3]

Hughes appeals his § 1983 claims. He argued in Count 5 of his complaint that he was deprived of his free speech right in violation of 42 U.S.C. § 1983. The district court granted directed verdicts in favor of the school board and Harrison on these claims. The court sent the § 1983 claims against Gregory and Lloyd to the jury only for purposes of appeal. When the jury returned a verdict in favor of Hughes against Lloyd and Gregory, Judge Kiser granted a JNOV in favor of the co-workers. Hughes contests each of these rulings before this court.

Hughes also appeals the district court's decision to grant a JNOV in favor of Lloyd on the issue of lost wages. In its special verdict, the jury found Lloyd (but not Gregory) liable to Hughes for some $18,000 in lost wages. Judge Kiser granted a JNOV in favor of Lloyd. Hughes contests the JNOV procedurally and on the merits. We are unpersuaded by any of Hughes' challenges to the judgment below. First, we examine the claims that the directed verdicts for the school board and Harrison on the § 1983 count were improper. Second, we consider Hughes' claim that the JNOV in favor of Lloyd and Gregory on the § 1983 claim was improper. Finally, we discuss the propriety of the JNOV in favor of Lloyd on the lost wages claim.

## II.

In ruling on the directed verdict motion, the district court must consider the record as a whole, and construe the evidence in the light most favorable to the non-movant. If the non-movant has presented substantial evidence in support of his position, evidence that is of such quality and weight that a fair and impartial jury could return a verdict for the non-movant, then a directed verdict is improper. *Craven v. Southern Railway*, 412 F.2d 835, 836 (4th Cir.1969).

■ To establish municipal liability under § 1983, the plaintiff must be able to show that the execution of a municipal policy or custom inflicts an injury. *Monell v. Dept. of Social Services of the City of New York*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). Hughes relies on the "custom or usage" aspect of the test to argue that he was injured, and he argues that Harrison was a policymaker who terminated him because of an impermissible motive. Neither position is tenable.

■ First, Harrison is not a policymaker under state statutory or case law. There is no reference in the state education law to a maintenance supervisor having the authority to terminate employees. Code of Virginia, Title 22.1. The state constitution gives control of the school system to the school board. Va. Const. Art. VIII, § 7. This control includes supervising personnel. *School Board v. Parham*, 218 Va. 950, 243 S.E.2d 468 (1978). Furthermore, we note that in *Pembaur v. Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), the Supreme Court held that, "[t]he fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Id.* at 481–82, 106 S.Ct. at 1299. "The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable." *Id.* at 482–83, 106 S.Ct. at 1299–1300. The law is against Hughes' position that Harrison dictated policy.

---

**3.** The jury returned a special verdict which found for Hughes against Lloyd and Gregory on the § 1983 claim. On the state law claims, the jury found for Hughes as against Lloyd, but not Gregory. As compensation, the jury awarded Hughes $5,000 in general damages, plus $18,879 in lost wages. The jury awarded punitive damages to Hughes in the amount of $5,000 against Lloyd and $1,000 against Gregory. The district court's decision to grant a JNOV on the § 1983 claims and the lost wages award are the only issues before us.

Second, the decision to discharge the three employees came from the Superintendent, Dr. Jones, who admitted that he did not know any of the individuals involved. This decision was carried out by Harrison, but not formulated by him.[4]

■ Third, there is a complete lack of evidence of any "custom or usage" engaged in by the school board to retaliate against whistleblowers. Hughes did not attempt to prove any kind of retaliation beyond the above-described incident. "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985). There is no reasonable inference of custom or usage that can be derived from these facts.

■ Finally, there is no evidence of a retaliatory motive on the part of the board. This court, in *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 241–42 (4th Cir.1982) explained that evidence which shows a probability, reasonable probability, or substantial probability of improper motive could go to the jury. A mere possibility, however, is insufficient to get to the jury. *See also, Foster v. Tandy Corporation*, 828 F.2d 1052, 1056 (4th Cir.1987). This probability standard is not met by Hughes' proof. He argues that Harrison retaliated by being cold to him. Harrison testified that during the period of tension, he was told not to talk to his subordinates, and that he was not aware of the extent of Hughes' participation in the investigations. Dr. Jones did not know any of those involved. The evidence, as we know it, reveals that Hughes complained to Harrison, Harrison spoke to Jones, and Jones decided to discharge the whole bunch. This does not amount to retaliatory motive absent the speculation eschewed in *Lovelace*.

■ Furthermore, we note that the district court did not err in directing a verdict for Julian Harrison on the § 1983 claim.

Proving supervisory liability is a difficult task in § 1983 cases. *Slaken v. Porter*, 737 F.2d 368, 373 (4th Cir.1984). Hughes argues that the only conclusion to be reached is that he was discharged by Harrison for an impermissible motive. One fact ends this argument—Harrison did not discharge Hughes, Jones did. The district court correctly found no supervisory liability here.

### III.

■ Hughes asserts that the actions of Gregory and Lloyd rose to the level of constitutional torts and seeks relief under § 1983. To obtain such relief, he must show that his co-workers deprived him of a constitutional or federal right, and that they were clothed with state authority in so acting. *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155, 98 S.Ct. 1729, 1733, 56 L.Ed. 2d 185 (1978); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970). Section 1983 proscribes the "misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Monroe v. Pape*, 365 U.S. 167, 184, 81 S.Ct. 473, 482, 5 L.Ed.2d 492 (1961).

■ Hughes argues that he was assaulted, battered, and subjected to intentional emotional distress under color of state law because he was accosted by county employees with retaliation in their eyes, on county land, with a county-owned rope, during work hours. He places particular emphasis on the motive of the attackers as evidencing state action. To support his claim, he cites to this court a number of cases wherein police officers or judges were held to have been acting under color of state authority during improper arrests or injudicious judicial acts. The above cases are distinguishable because the actions complained of were committed while the defendants were purporting to act under the authority vested in them by the state, or were otherwise made possible because of

---

4. Even if Harrison had made the decision to discharge Hughes, the decision could be appealed to the Superintendent. This appellate process makes Harrison's act not the final act of policy.

the privileges of their employment. The judges were figuratively and literally clothed in state power, and the officers were acting behind badges. Gregory and Lloyd were wearing, at best, county coveralls. The indicia of state authority just isn't the same. Furthermore, if the actions of Gregory and Lloyd amount to state action, any employee of any state who commits a tort has potentially violated § 1983. We cannot endorse such a result.

### IV.

After the jury returned a verdict against Lloyd on the issue of lost wages, Lloyd petitioned the court for a JNOV, arguing that the hanging incident was not the proximate cause of Hughes' lost wages. Judge Kiser ruled that Lloyd was correct, that the incident did not proximately cause Hughes' loss. Hughes attacks Judge Kiser's disposition in two ways.

■ First, he argues that the JNOV was procedurally improper because Lloyd did not make a motion for a directed verdict on the issue of lost wages before the jury rendered its verdict. Second, he argues that the scuffle at Turbeville was indeed the proximate cause of his loss. As to the first argument, Judge Kiser made plain to all the parties that he would grant a JNOV on the claim if the jury came back with a plaintiff's verdict. As a result, it was understood by everyone that a directed verdict had already, technically, been entered.[5] Lloyd's position was preserved and ripe for a JNOV.

■ Hughes' second argument, that Gregory and Lloyd's attack proximately caused his lost wages is also unpersuasive. Whatever Lloyd and Gregory did to Hughes at the school, they could not directly cause him to lose his job and his wages. Only Dr. Jones could take Hughes' job from him and there is no allegation that

Lloyd and Gregory have control over Jones.[6] The issues raised by Hughes are not compelling and the verdicts below are

AFFIRMED.

---

5. Judge Kiser explained his belief that "[s]ubmission to the jury of the question of lost wages was a necessary element of damages in regard to the § 1983 claim (Count V), but it was understood that a directed verdict had already been entered as to this count...." Joint Appendix at 274.

6. We note that Hughes' complaint undercuts his causation position on appeal. The complaint does not allege that the cause of his dismissal was the assault, but rather that it was "the direct result of his cooperation with the Grand Jury investigation and the fact that he is black." Joint Appendix at 10.