**UNITED STATES of America**

v.

**Eva C. TEMPLE, Defendant.**

**No. 03 CR.885(DC).**

United States District Court,
S.D. New York.

Nov. 5, 2004.

his confrontation clause claim due to their destruction is baseless.

David N. Kelley, Esq., United States Attorney for the Southern District of New York, by William C. Komaroff, Esq., Richard Daddario, Esq., Assistant United States Attorneys, New York, NY.

Leonard F. Joy, Esq., The Legal Aid Society, Federal Defender Division, by Mark B. Gombiner, Esq., New York, NY, for Defendant Eva C. Temple.

### *OPINION*

CHIN, District Judge.

On March 5, 2003, two New York City police detectives arrested defendant Eva C. Temple for threats she had made toward her landlord. Temple was an employee of the Internal Revenue Service (the "IRS"), and the detectives arrested her at IRS offices in Manhattan. During the course of the arrest and as the detectives were transporting Temple to a police precinct in Queens, she threatened to initiate an audit of their tax returns.

On May 2, 2003, the IRS fired Temple for unrelated employment problems. On June 12, 2003, Temple left a threatening voicemail for the IRS employment specialist who had handled her separation.

Temple was indicted in this case for these incidents. Count 1 charges her with willful oppression under color of law, for her conduct in threatening the detectives with an audit. Count 2 charges her with forcible interference with a federal employee engaged in official duties, for the threatening voicemail she left for the IRS employment specialist.

On July 14, 2004, a jury convicted Temple on both counts. Before the Court is

Temple's motion pursuant to Fed. R.Crim.P. 29(c)(2) for a judgment of acquittal as to both counts. Alternatively, Temple moves for a new trial pursuant to Fed.R.Crim.P. 33.

For the reasons that follow, the Rule 29(c)(2) motion is granted as to Count 1 and both motions are denied as to Count 2.

### STATEMENT OF THE CASE

#### A. Background

■ The facts are construed in the light most favorable to the Government. See United States v. Hamilton, 334 F.3d 170, 179 (2d Cir.2003).

##### 1. Temple's Arrest

On March 5, 2003, two detectives from the New York City Police Department arrested Temple while she was working as a program analyst at an IRS office in Manhattan. (Tr. at 20–21; GX 6).[1] Temple was arrested pursuant to a charge of aggravated harassment following allegations that she threatened her landlord with "physical harm and death." (Id. at 22). The arresting detectives attempted to contact Temple and allow her to voluntarily surrender, but after "numerous" unsuccessful attempts the detectives decided to arrest Temple at her place of employment. (Id. at 22–23). When the detectives took Temple into custody, she became "very violent" and "abusive." (Id. at 25). As a result of Temple's behavior, the detectives handcuffed her and forcibly escorted her from the building and placed her in their vehicle. (Id. at 24–26).

In the vehicle, Temple continued to be abusive and belligerent towards the officers, kicking the detective who was in the back seat with her. (Id. at 26). During the ride to the precinct in Queens Temple told the detectives that she was "an IRS employee and ... had the ability to initiate investigations and audits into [their] tax histories." (Id.). She also stated that "there were a number of brothers and sisters who held a grudge against the NYPD and would be willing to do the same on her behalf" and that she was part of a "group of militant black IRS employees employed at the IRS ... that hate [the] NYPD" and that she would contact these "militants" to initiate an audit of the detectives because of her arrest. (Id. at 26, 36). At the precinct, Temple continued to act irrationally and make comments to the officers, some of which caused the officers to laugh. (Id. at 43, 45). Eventually, the officers contacted the police emergency services unit. (Id. at 43–44). The emergency services unit considered using a Taser gun to subdue Temple and eventually took Temple to a psychiatric hospital for evaluation and treatment. (Id. at 44). Temple did not cause any audits to be initiated.

##### 2. Temple's Dismissal from the IRS and Threat to Petherbridge

In late 2002, IRS Senior Labor Relations Specialist James Petherbridge was contacted by Temple's supervisor about an incident involving Temple in Philadelphia. (GX 4; Tr. at 55–57). Petherbridge's responsibilities at the IRS included, among other things, assisting IRS management with administrative issues such as employee removals. (Tr. at 54). In the Philadelphia incident, as Petherbridge learned in his investigation, Temple confronted a federal protective service officer when she was asked to display photo identification after she set off a magnetometer at an IRS office. (Tr. at 66; GX 4). After placing

---

1. Citations to "Tr." refer to the trial transcript. Citations to "GX" refer to government exhibits admitted into evidence at trial.

her photo identification "within an inch of the officer's face," Temple left the building, only to return a short time later and berate the officer by cursing and insulting him. (GX 4).

This incident, along with three other episodes of "disruptive behavior and insubordination" for which she was suspended, caused Petherbridge to recommend to Temple's superiors in December 2002 that she be fired. (*Id.;* Tr. at 64–72). During Petherbridge's continuing investigation thereafter, he also learned about the circumstances surrounding Temple's March 5, 2003 arrest described above, including Temple's physical and verbal assaults on the arresting officers. (Tr. at 69–70).

Temple was fired from the IRS effective May 2, 2003. (*Id.* at 73; GX 5). Following her dismissal, Temple failed to return her IRS identification badge as required. (Tr. at 73–74; GX 7). On June 12, 2003, Petherbridge received a telephone call from a bank officer seeking to verify Temple's identity. (Tr. at 75). Apparently, Temple was using her IRS identification at the bank. (*Id.*). Petherbridge was able to identify Temple because he heard her "yelling in the background." (*Id.*). Petherbridge then asked the bank representative to confiscate Temple's IRS identification. (*Id.*). The bank representative was not able to do so because Temple's identification had already been returned to her. (*Id.*).

That afternoon, at approximately 5:12 p.m., Temple left a voicemail for Petherbridge on the IRS messaging system. (GX 1; Tr. at 53, 76–77). The following morning, June 13, 2003, Petherbridge played the voicemail and heard the following message left by Temple in an angry and hostile voice: "yeah, you faggot ass bitch ass stupid faggot fuck. I'm gonna fuck you up, you faggot bitch." (*Id.* at 76–77; GX 1).

After listening to the voicemail, Petherbridge testified he was "basically petrified" and "immediately" contacted a special agent for the Inspector General for Tax Administration at the Department of the Treasury to report the incident. (*Id.* at 77, 111). Petherbridge testified that he did not know where Temple was when he received the voicemail and "was afraid and had lunch the next week in [his] office because [he] was really afraid to go out." (*Id.* at 78). Petherbridge testified that he was afraid because he "was well aware of [Temple's] actions when she was arrested, her beating up the detectives in the car and the fact that she had threatened to hurt or kill her former landlord and child. So that led [him] to have great concerns about [his] own safety." (*Id.*).

## B. *Prior Proceedings*

The July 3, 2003 Indictment in this case contains two counts. Count 1 charges Temple with willfully oppressing a person under color of law by threatening two New York City police detectives with an IRS audit in retaliation for arresting her, in violation of 26 U.S.C. § 7214. Count 2 charges that Temple forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with an officer or employer of the United States while engaged in or on account of the performance of his official duties, in violation of 18 U.S.C. § 111.

Trial commenced on July 12, 2004. At the close of the government's evidence, Temple moved pursuant to Rule 29 for an acquittal on both counts of the indictment. I reserved decision. Temple did not put on a defense case, and following Temple's conviction on both counts, Temple renewed her motion for acquittal and also moved pursuant to Rule 33 for a new trial. The parties briefed both motions and presented oral argument.

## DISCUSSION

I begin by discussing the standards applicable to post-trial motions in criminal cases. I then discuss each count in turn.

### A. Fed.R.Crim.P. 29 & 33

Rule 29 provides that:

[T]he court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense.

Fed.R.Crim.P. 29(a). "A conviction must be upheld if, after viewing the evidence in the light most favorable to the Government, and drawing all reasonable inferences in its favor, '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Medina,* 944 F.2d 60, 66 (2d Cir.1991) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). Therefore, a jury's verdict will be affirmed "so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt." *United States v. Hamilton,* 334 F.3d 170, 179 (2d Cir.2003); *see also United States v. Nersesian,* 824 F.2d 1294, 1324 (2d Cir.1987) ("A jury's verdict will be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it.").

■ Pursuant to Fed.R.Crim.P. 33, a court may grant a defendant's motion for a new trial "if the interests of justice so require." A new trial is to be granted only "in the most extraordinary circumstances." *United States v. Locascio,* 6 F.3d 924, 949 (2d Cir.1993). The defendant bears the burden of proving that this extraordinary remedy should be granted, *see United States v. Sasso,* 59 F.3d 341, 350 (2d Cir. 1995), and the decision to order a new trial rests within the discretion of the trial judge. *See United States v. Sanchez,* 969 F.2d 1409, 1413 (2d Cir.1992).

### B. Count 1

#### 1. 26 U.S.C. § 7214(a)(1)

■ Count 1 of the indictment charges Temple with willfully oppressing a person under color of law, in violation of 26 U.S.C. § 7214(a)(1). The statute provides:

Any officer or employee of the United States acting in connection with any revenue law of the United States—(1) who is guilty of any extortion or willful oppression under color of law . . . shall be dismissed from office or discharged from employment and, upon conviction thereof, shall be . . . imprisoned not more than five years.

26 U.S.C. § 7214(a)(1). To prove a violation of § 7214(a)(1), the government must prove the following three elements: first, at the time of the acts alleged, the defendant was an officer or employee of the United States; second, the defendant was acting in connection with a revenue law of the United States; and third, the defendant willfully oppressed a person under color of law. (Tr. at 192).[2]

Here, there was no real dispute as to the first element: Temple was an employee of the IRS. Although there was more of a dispute as to the second element, a reasonable jury could have found that Temple was acting in connection with the revenue laws because her threat to the detectives involved IRS audits. The real issue is the

---

**2.** The Court's charge in this case was drafted on the basis of the language of the statute and pattern instructions for other crimes, for even Judge Sand's pattern instructions, Leonard B. Sand *et al., Modern Federal Jury Instructions,* (2004), does not have a proposed charge for a § 7214 count.

third element: whether Temple willfully oppressed the detectives under color of law.

### 2. *Willful Oppression Under Color of Law*

#### a. *Applicable Law*

The parties have not cited, and the Court's own research has not found, any reported decision in a case involving a conviction under 26 U.S.C. § 7214(a)(1) for "willful oppression." There are some civil cases in which plaintiffs unsuccessfully argued for a private cause of action for damages under § 7214(a)(1), and there are some decisions addressing convictions under other parts of § 7214(a), including, for example, cases involving fraud and the acceptance of a gratuity. But there is simply no case law interpreting "willful oppression under color of law" in the context of criminal charges under § 7214(a)(1). Hence, we look elsewhere for guidance.

[redacted] Willfully in the context of this statute means that the defendant acted voluntarily with the specific intent to oppress a person in connection with the revenue laws of the United States. (Tr. at 192). *See, e.g.,* Leonard B. Sand *et al., Modern Federal Jury Instructions,* Instr. 17–7 (2004).

[redacted] Oppression means conduct intended to harm, frighten, or inhibit the free action of another person. *Id.,* Instr. 17–4 (defining color of law as used in 18 U.S.C. § 242 defining the deprivation of civil rights). Oppression should be "taken in its ordinary sense, which is an act of cruelty, severity, unlawful extraction, domination, or excessive use of authority." *United States v. Deaver,* 14 F. 595, 597 (W.D.N.C.1882).

[redacted] The color of law requirement is interpreted broadly. *United States v. Walsh,* 194 F.3d 37, 50 (2d Cir.1999); *see also United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941). A person acts under color of law by misusing power, "possessed by virtue of state [or federal] law and made possible only because the wrongdoer is clothed with the authority of state [or federal] law." *Id.* The "relevant question" when determining whether an action was under color of law "is not whether the [action] was part of the defendant's official duties but, rather, whether the [action] was 'made possible only because the wrongdoer is clothed with the authority of state [or federal] law.' " *Walsh,* 194 F.3d at 51 (quoting *Classic,* 313 U.S. at 326, 61 S.Ct. 1031); *see also Monsky v. Moraghan,* 127 F.3d 243, 245 (2d Cir.1997). "Section 7214 imposes sanctions on revenue agents for departures from the high standards of conduct demanded of those holding that office. Quite realistically, some of those derelictions may be committed outside the performance of the officer's official duties." *United States v. Stern,* 418 F.2d 198, 199 (2d Cir.1969).

"Whether a government employee is acting under color of law is not always an easy call, especially when the conduct is novel." *Gritchen v. Collier,* 254 F.3d 807, 813 (9th Cir.2001). Although case law construing "under color of law" under § 7214 is scarce, "[c]ourts have had frequent occasion to interpret the term 'color of law' for the purposes of § 1983 actions." *Pitchell v. Callan,* 13 F.3d 545, 547–548 (2d Cir. 1994). These cases require that courts look beyond the actual duty status of the actor to "the nature of the officer's act." *Id.* at 548. Color of law analysis should inquire whether the action was "committed in the performance of any actual or pretended duty." *Id.* (quoting *Bonsignore v. City of New York,* 683 F.2d 635, 639 (2d Cir.1982) (quoting *Johnson v. Hackett,* 284 F.Supp. 933, 937 (E.D.Pa.1968))).

#### b. *Application*

[redacted] I conclude that no reasonable jury could have found that Temple willfully op-

pressed the detectives under color of law. Looking at the nature of Temple's acts, I conclude that the jury's verdict of guilty on Count 1 must be set aside, for no reasonable jury could have found that the government had proven the third element beyond a reasonable doubt.

Although Temple clearly acted willfully in an attempt to interfere with the detectives' efforts to arrest her and transport her to the precinct, her actions were not "clothed" with authority and she was not acting under "color of law" in any meaningful sense. Her tantrum was not part of the performance of any actual or pretended duty, and she was not empowered—actually or even apparently—to punish the officers for arresting her.

To the contrary, Temple had no power or authority, and it was clear in the circumstances here that she did not. Indeed, she had already been placed under arrest and handcuffed. She engaged in an incoherent outburst and eventually was treated as an emotionally disturbed person: a police department emergency services unit was summoned, and the unit considered using a Taser gun to subdue her. The officers were laughing at Temple and eventually they took her to a psychiatric hospital for evaluation and treatment. Throughout this series of events, Temple called one of the detectives by the wrong name.

Moreover, as early as December 2, 2002, some four months earlier, Temple had been put on notice that the IRS was proposing to "remove" her from service, and she had previously been progressively disciplined for other incidents with one-day, nine-day, and then 14-day suspensions. (GX 4). Clearly, her employment was precarious even before the detectives arrested her. Finally, although the record shows that Temple was employed at the IRS as a "program analyst," the record contains no description of her duties (*see id.;* Tr. at 32), and there simply was no factual basis in the record for a jury to conclude that Temple had the power or ability to initiate an audit of the detectives' tax returns.[3]

Under these circumstances, no reasonable jury could have concluded that Temple abused her power as an IRS employee to willfully oppress the detectives when, in the course of her emotional, incoherent reaction to being arrested, she threatened them with a tax audit.

Temple's motion under Fed.R.Crim.P. 29(c)(2) for a judgment of acquittal as to Count 1 is granted and the jury's verdict as to Count 1 is overturned.[4]

### C. *Count 2*

#### 1. *18 U.S.C. § 111*

Count 2 charges that Temple forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with an officer or employer of the United States engaged in or on account of the performance of his official duties, in violation of 18 U.S.C. § 111. The statute provides: "[w]hoever forcibly assaults, resists, opposes, impedes,

---

3. Of course, the parties have not cited, and the Court has not found, a reported case with facts similar to these. *But see, e.g., Hughes v. Halifax County School Board,* 855 F.2d 183, 187 (4th Cir.1988) (comparing judges and police officers "clothed in state power" to two maintenance workers clothed in "county coveralls" and finding the "indicia of state authority just [are not] the same"); *cf. Walsh,* 194 F.3d at 51 (totality of the circumstances showed actor was within his authority).

4. Temple moves for a new trial on Count 1 pursuant to Rule 33 under the doctrine of retroactive misjoinder because of purportedly prejudicial evidence introduced in support of Count 2. *See Hamilton,* 334 F.3d at 182 (2d. Cir.2003) (internal quotations omitted); *United States v. Jones,* 16 F.3d 487, 493 (2d Cir. 1994). Temple also moves for a new trial on Count 1 for improper venue. Both prongs of this motion are moot as Count 1 is dismissed.

intimidates, or interferes with any [officer or employee of the United States] while engaged in or on account of the performance of official duties ... shall ... be imprisoned not more than five years." 18 U.S.C. § 111.

To prove a violation of § 111, the government must prove four elements: first, the targeted individual was a federal officer or employee; second, the defendant forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with the federal officer or employee; third, the defendant acted knowingly and willfully; and fourth, the federal officer or employee was engaged in the performance of his official duties or that the assault or interference occurred on account of the performance of his official duties. (Tr. at 195). *See* Leonard B. Sand *et al.*, *Modern Federal Jury Instructions*, Instr. 14–2 (2004).

Here, there was no real dispute as to the first, third, and fourth elements. The disputed element was the second element: forcible assault or intimidation of or interference with a federal officer or employee.

### 2. *Forcible Assault, Intimidation, or Interference*

#### a. *Applicable Law*

▮ Congress intended § 111 to "deter harm to certain federal officials and to deter interference with their law enforcement activities." *United States v. Walker*, 835 F.2d 983, 987 (2d Cir.1987). The standard for determining whether the requisite degree of force was displayed is an objective one: "whether the defendant's behavior would reasonably have inspired fear in a reasonable person." *Id.*

▮ The term "forcibly" in § 111 does not require actual use of force. *Id.* The threat of force is sufficient. *Id.* The force element of § 111 may be satisfied by proof that there was such a threat or display of physical aggression toward the officer as to inspire fear of pain, bodily harm, or death. *Id.* If the force element is to be established by proof of a threat rather than by proof of actual touching, the threat must be of "immediate harm," or "imminent bodily harm," not at some point in the indefinite future. *Id.* ("[I]mplied threat of the use of force sometime in the indefinite future would not suffice to violate § 111."); *United States v. Bamberger*, 452 F.2d 696, 699 (2d Cir.1971); *see also Cunningham*, 509 F.2d at 963 ("Threats of future use of force are not enough."). Hence, the Second Circuit has suggested that the threat "I will get you after work" is not sufficient to meet the requirements of § 111. *Walker*, 835 F.2d at 988. Of course, the line between "immediate" or "imminent" harm and future harm is not always clear. *See United States v. Cunningham*, 509 F.2d 961, 963 (D.C.Cir.1975) ("Whether a person has opposed the efforts of federal agents with sufficient force to engage the statute can thus be a troublesome question of degree.").

The common law meaning of "simple assault" is a crime "committed by either a willful attempt to inflict injury upon the person of another, or by a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm." *United States v. Chestaro*, 197 F.3d 600, 605 (2d Cir. 1999) (quoting *United States v. Johnson*, 637 F.2d 1224, 1242 n. 26 (9th Cir.1980)). "Because Congress was silent as to the meaning of 'simple assault' when it adopted § 111," the common law definition applies. *Id.*

#### b. *Application*

Temple moves to set aside the conviction on Count 2 principally on the argument that the jury could not have reasonably found a threat of "immediate harm" be-

cause her threat was in the form of a voicemail message. Indeed, Temple has cited numerous cases holding that a telephone threat is not grounds for an action for assault. (Def.Mem.7–8). These cases conform to the concept that a telephone call or voicemail lacks the immediacy required for common law assault. *See Alter v. Lawlor,* No. CV990591658S, 2003 WL 1090630, \*1 (Conn.Super., Feb.27, 2003) (holding a telephone call is not grounds for an action for assault, because it lacks the requisite "imminence"). The government, on the other hand, cites a case holding that a telephone threat was properly charged as an assault. *See State v. Smith,* 322 Mont. 206, 95 P.3d 137 (2004). Actions for assault based on a telephone call or voicemail typically fail because they lack immediacy. That is not to say, however, that a bright line rule exists, for under certain circumstances immediacy will be present even when the threat is conveyed via a telephone call or voicemail message.

■ Here, even assuming a telephone call or voicemail message cannot be the basis for an assault finding as a matter of law, Temple's argument in this respect must be rejected. Section 111 criminalizes more than assault; it also criminalizes forcibly resisting, opposing, impeding, intimidating, or interfering with an officer or employer of the United States while engaged in or on account of the performance of his or her official duties. *See United States v. Henderson,* 770 F.2d 724, 730 (8th Cir.1985) (affirming conviction under § 111 even though evidence did not establish an assault against postal officer because there was "ample evidence to sustain a conviction on the basis [the defendant] willfully and forceably [sic] impeded, intimidated and interfered with a United States mail carrier."). In other words, § 111 can be violated even in the absence of an "assault."

Ultimately, the issue is whether the government's evidence showed that Temple forcibly intimidated or interfered with Petherbridge in or because of the performance of his duties. That turns, in part, on whether the voicemail left by Temple posed an immediate or imminent threat to Petherbridge. Under the totality of circumstances in this case, this requirement was met. *See Cunningham,* 509 F.2d at 963.

First, as the evidence showed, Temple's threat was to cause immediate or imminent harm. A reasonable jury could find that the words "I'm gonna fuck you up, you faggot bitch" (as opposed to the words "I *will* fuck you up" or "I'm gonna fuck you up *after work*") were expressing an immediate or imminent threat. This is particularly so in view of the following circumstances: the angry harsh tone of the message; the sense of immediacy in Temple's voice; her knowledge of where Petherbridge's office was located; her ability to gain access to the building (she still had her IRS credentials); and the timing of the telephone call (*i.e.,* the same day that Temple tried unsuccessfully to use her IRS credentials at a bank). Indeed, a reasonable jury could have found that Temple might very well have been in the building or across the street or somewhere else nearby, waiting for Petherbridge to leave work at the close of the business day, when she placed the telephone call.

Second, the evidence showed that Petherbridge was actually intimidated by the voicemail. Petherbridge was "petrified" and he believed that he was in immediate danger of Temple assaulting or interfering with him. 18 U.S.C. § 111; (Tr. at 77). Petherbridge was intimately aware of Temple's past; he knew of the Philadelphia incident, where Temple left and then returned and berated a security officer after an initial altercation. (GX 4; Tr. 78).

He also knew that Temple still had her IRS credentials and was aware that Temple had not only threatened violence in the past, but had engaged in violence against others. (GX 4; Tr. 78). Moreover, given Petherbridge's prior knowledge about Temple, it was objectively reasonable for him to be afraid that he was in imminent danger from Temple. *See Walker*, 835 F.2d at 987 ("The proper standard for determining whether the requisite degree of force was displayed ... is an objective one, *i.e.*, whether the defendant's behavior would reasonably have inspired fear in a reasonable person.").[5]

Third, Temple's actions are clearly the type of conduct § 111 seeks to prevent. The statute prohibits "any acts or threats of bodily harm that might reasonably deter a federal official from the performance of his or her duties." *Walker*, 835 F.2d at 987. Petherbridge was deterred. He testified at trial that he was afraid to go out for lunch for at least a week because of the voicemail, combined with what he knew about Temple's violent past. The jury could have reasonably found that this intimidation was precisely what Temple intended when she left the voicemail. Petherbridge was doing his job both in his investigation of Temple and when he requested that the bank officer confiscate Temple's IRS credentials. By leaving the voicemail, Temple clearly was seeking to punish Petherbridge for his performance of his duties in the past or to intimidate him as he continued to deal with Temple's dismissal in the future.

The Supreme Court in *Ladner* discussed the hypothetical situation of an individual locking a door of a building to prevent the entry of officers intending to carry out an arrest as being "an act of hindrance denounced by the statute." *Ladner*, 358 U.S. at 176, 79 S.Ct. 209. The officers in that hypothetical would not have been concerned for their personal safety necessarily, but § 111 nonetheless applied, for the statute criminalizes forcibly impeding or interfering with federal officials. The point is that § 111 is not limited to assault cases. There is nothing in the legislative history to suggest otherwise.

At one point during its deliberations, the jury sent out a note asking whether it was enough if the threat was to harm Petherbridge "as soon as possible." (Ct. Ex. 3; Tr. at 218). In response, I instructed the jury as follows:

> For the government to prove this element, it must prove such a threat or display of physical aggression towards Mr. Petherbridge as to inspire fear of pain, bodily harm, or death. The threat must be of immediate harm. What do I mean by immediate harm? I mean a present, real, concrete, definitive, and explicit threat of bodily harm rather than a speculative, vague, or indefinite threat, or an implied threat to use force sometime in the indefinite future. The government must prove beyond a reasonable doubt that the threat of bodily harm must have been so real and concrete that it would have inspired fear in

---

5. Much is made of the timing of Temple's voicemail as it was left the evening before Petherbridge listened to it. I do not find it dispositive that the voicemail was left the day before Petherbridge listened to it. The key is what Temple said to Petherbridge and the tone in which it was said. Indeed, Temple did not know that Petherbridge would not be in his office, nor could she have known

whether he was still in the office but merely away from his desk. *See Walker*, 835 F.2d at 987; *Ladner v. United States*, 358 U.S. 169, 176, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958) ("Clearly, one may resist, oppose, or impede the officers or interfere with the performance of their duties without placing them in personal danger.").

a reasonable person of imminent bodily harm.

(Tr. at 229–30). The evidence was sufficient for the jury to conclude that the threat was present, real, concrete, definitive, and explicit, and not just speculative, vague, or indefinite, and "that imminent bodily harm would have been feared by a reasonable person standing in [Petherbridge's] shoes." *See Walker*, 835 F.2d at 987. The jury's verdict as to Count 2 of the indictment will stand.

### CONCLUSION

For the foregoing reasons, Temple's Rule 29 motion is granted as to Count 1 and denied as to Count 2, and her Rule 33 motion is moot as to Count 1 and denied as to Count 2. A judgment of acquittal is ordered as to Count 1. Temple will be sentenced on Count 2 on December 15, 2004, at 4:30 p.m.

SO ORDERED.