949 F.2d 1338
 60 USLW 2436, 34 Fed. R. Evid. Serv. 824
 James H. JOHNSON, a/k/a James H. Ferebee; Commonwealth of
Virginia, Plaintiffs-Appellees,
v.
HUGO'S SKATEWAY; Lois Leasing Firm, Incorporated,
Defendants-Appellants.
James H. JOHNSON, a/k/a James H. Ferebee, Plaintiff-Appellant,
and
Commonwealth of Virginia, Plaintiff,
v.
HUGO'S SKATEWAY; Lois Leasing Firm, Incorporated,
Defendants-Appellees.
 Nos. 90-2499, 90-2509.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 7, 1991.
Decided Nov. 22, 1991.
As Amended Dec. 9, 1991.
 
 Earle Duncan Getchell, Jr., McGuire, Woods, Battle & Boothe, Richmond, Va., argued (Cynthia E. Hudson, on brief), for defendants-appellants.
 Douglas Bruce McFadden, McFadden, Evans & Sill, Washington, D.C., argued (James A. Kline, IV, Jerusa Carl Wilson, Jr., on brief), for plaintiff-appellee Johnson.
 William Mark Dunn, Asst. Atty. Gen., Richmond, Va., argued (Mary Sue Terry, Atty. Gen. of Virginia, on brief), for plaintiff-appellee Com. of Va.
 Before MURNAGHAN and NIEMEYER, Circuit Judges, and YOUNG, Senior District Judge for the District of Maryland, sitting by designation.
 OPINION
 MURNAGHAN, Circuit Judge:
 
 
 1
 Appellee James H. Johnson also known as James H. Ferebee (Johnson), a 30 year-old black male, joined four friends for an evening of roller skating at appellant Hugo's Skateway (Hugo's) in Warrenton, Virginia. Johnson was the only black patron in the rink that evening. Johnson is a fairly accomplished skater whose exploits on the floor of Hugo's caught the attention of the skateway's management, particularly that of the owner, Edith Stribling, who allegedly felt that Johnson was skating in an unsafe manner. Within an hour of closing, Stribling directed the rink's assistant manager, Daniel Wright, to call Johnson off of the floor. Wright asked Johnson to accompany him to a "back room," but Johnson refused.
 
 
 2
 Stribling thereupon summoned the Fauquier County Sheriff's Department, and with about a half hour left until closing, Deputy Sheriff R. Edward Wines arrived. Wines promptly arrested Johnson by throwing him to the floor, placing him in a choke hold, and handcuffing him. Wines then took Johnson to the Fauquier County Jail, where Johnson was jailed without bond.
 
 
 3
 Johnson brought suit against Wines and Hugo's in the United States District Court for the Eastern District of Virginia claiming deprivation of constitutional rights under 42 U.S.C. § 1983 and various pendent state law claims against both defendants.
 
 
 4
 After a directed verdict was entered in Hugo's favor on the section 1983 claim and false imprisonment and false arrest claims, and after a directed verdict was entered in Wines' favor on a racial harassment claim, the jury found against Wines on the three remaining claims against him and against Hugo's on a racial harassment claim. Compensatory damages of $200 and punitive damages of $500 were assessed against Wines. Compensatory damages of $25,000 and punitive damages of $175,000 were assessed against Hugo's.
 
 
 5
 Subsequently, counsel for Johnson filed an application for $113,469 in attorneys' fees and $1,308 in costs. The district court awarded $15,000 in fees and $654 in costs. Hugo's has appealed on various grounds. Johnson has cross-appealed on the issue of attorneys' fees.
 
 I.
 
 6
 Johnson, a black male, resided in Centerville, Virginia. On February 17, 1989, Johnson attended Hugo's Skateway in Fauquier County for an evening of rollerskating. Johnson was accompanied by four of his friends; a white male, Mike Solater, and three white females, Susan Steele, Marcia Bowen, and Jennifer Stemp White. Johnson was the only black patron at Hugo's that night. The only other black person at the rink that evening--Clarence Lane--was a Hugo's employee.
 
 
 7
 It was undisputed that Johnson had skated for years; in his own opinion and in the opinions of his peers, he has been an accomplished, cautious skater who is controlled and even goes out of his way to help children in need on the skating floor. There was, nevertheless, conflicting testimony at trial as to whether Johnson was skating safely on the evening in question. Johnson and other witnesses presented by him testified that he was not causing any disturbance at the rink. Steele, for example, testified that Johnson has always been a careful skater, that on the night in question and on other occasions they had skated together, that Johnson was not causing anyone to fall down on the rink, and that Johnson had not moved children out of his way so that he could skate past. On the other hand, Edith Stribling testified that she requested three times over the rink intercom system that evening that skaters slow down, but admitted that she did not direct her announcements to Johnson in particular.
 
 
 8
 Nonetheless, with only about an hour left until closing, Hugo's assistant manager, Daniel Wright, at Stribling's direction, approached Johnson at rinkside and asked Johnson to accompany him off the skating floor. When doing so, however, Wright asked only that Johnson accompany him to the "back room." Wright admitted that he never told Johnson why he wanted to see him. Johnson replied that he would have left if that was what Hugo's wanted him to do, but he was not asked to do so.
 
 
 9
 Johnson, an out-of-towner, testified that he felt threatened by the unexplained request of a white manager in an overwhelmingly white establishment to accompany him to a "back room." While Johnson had had occasion to visit a room in the rear of the rink previously, there was no evidence that Johnson was familiar with the "back room" to which Wright asked him to proceed on the night in question. After Johnson refused to accompany Wright, Stribling summoned the Fauquier County Sheriff's Office to the rink.
 
 
 10
 Johnson testified that he could not understand why he was singled out from a crowd of approximately 150 people when he was not skating any differently from the other skaters, and after he had skated at times with employees of the rink. Lane corroborated Johnson's testimony by noting that, while working, he had "rhythm skated" with Johnson, for which no one had expressed any disapproval. Stribling admitted that Hugo's had a policy of warning skaters three times that their skating was unacceptable before the rink took any action. She did not know whether Johnson was given the same courtesy. Wright testified that part of the rink's objection to Johnson's skating concerned his skating within a rectangle painted on the center of the rink floor, but a rule prohibiting or limiting skating in that area was not posted at the rink and Johnson was never informed of such a rule.
 
 
 11
 Stribling testified at deposition that at least a half-hour passed, and testified at trial that about fifteen minutes had passed, between the time she called the sheriff's department and the time Deputy Wines arrived. Wines had known the Striblings for years, having been formerly employed by Hugo's as a private security guard. Before Wines arrived at the rink, Stribling did not attempt to talk to Johnson, despite the fact that he sat on a bench directly in front of the glass-enclosed office where Stribling was working.
 
 
 12
 Upon arriving at the rink, Wines immediately approached and spoke with Stribling, who directed his attention to Johnson, "a black man wearing tan pants." Thereafter, Wines arrested Johnson by throwing him to the ground, placing him in a choke hold, and handcuffing him; and then transported him to the magistrate's office and the Fauquier County Jail, where he was incarcerated for the night. Johnson was jailed without bond.
 
 
 13
 Sharon Crawford, an ex-employee of Hugo's, worked in the glass enclosed office where admission fees were collected with Stribling the night after the incident. Crawford and Stribling often worked together in the office. Crawford testified that after Stribling collected admission fees from interracial couples, Stribling would turn to people in the office and asked whether they had seen "that hussie with that nigger." Stribling admitted that she was collecting admission on February 17, 1989 and took admission from Johnson, who paid the requisite amount for himself and his white friends that night.
 
 
 14
 Charles Crawford had previously worked at the rink on Saturday nights as a skate guard, and was working the night after the incident in question. Upon arriving to work that night he was told by Stribling that "a nigger" had caused trouble on the previous night and had been ejected. Because one of Mr. Crawford's duties was to eject patrons who had been previously ejected, he was instructed to "keep an eye out" for Johnson and his "buddies" that night. Hugo's also had a policy of keeping "ejection slips" which recorded the names of ejected individuals and sometimes noted their race. Yet Stribling testified that the purpose of keeping the slips was to know "what they have done or what they were ejected for."
 
 
 15
 At the time of the Johnson incident, Hugo's was under a federal court consent decree entered on April 20, 1979 in the Eastern District of Virginia between the United States Department of Justice and Hugo's Skateway, et al. The consent decree had been executed after the Department of Justice had filed an action against Hugo's under 42 U.S.C. § 2000a et seq., regarding equal access to public accommodations for "discriminat[ing] against black persons by denying to them, on the basis of race, the use and enjoyment of the facilities and services of Hugo's on the same terms and conditions as the facilities were provided to white citizens."
 
 
 16
 The consent decree ordered that Hugo's make its facilities equally available to all citizens regardless of race or color, that Hugo's post and keep posted notices that read "Hugo's Skateway Admits and Services All Persons on the Same Terms, Without Regard to Race or Color," and that Hugo's should instruct all of its employees to make the facilities and services of Hugo's available to all persons. The consent decree is continuing in nature and the district court has retained jurisdiction over it for the purpose of reviewing Hugo's compliance.
 
 
 17
 Despite the consent decree's requirement that Hugo's prominently post and keep posted signs stating a policy of non-discrimination, Stribling did not know if signs had been posted in the several months preceding trial. However, Mr. and Ms. Crawford, who worked at the rink from sometime in 1985 to May, 1989, said that they had never seen such signs at the rink. Clarence Lane could not remember ever seeing such signs. In addition, the Crawfords and Lane, all former employees of Hugo's, testified that they had never been instructed not to discriminate at the rink on the basis of race or color, although the consent decree required that all employees at the rink be so instructed. Stribling "had no knowledge" of instructing employees to make Hugo's facilities available to all persons.
 
 
 18
 Johnson filed the instant action on November 13, 1989 in the United States District Court for the Eastern District of Virginia. In his complaint, Johnson alleged the deprivation of his civil rights under 42 U.S.C. § 1983 against Wines and Hugo's. Johnson also alleged false arrest and false imprisonment, and racially motivated harassment and intimidation in violation of section 8.01-42.1 of the Virginia Code, Va.Code Ann. § 8.01-42.1 (Supp.1990), against both defendants. Finally, Johnson alleged assault and battery against Wines.
 
 
 19
 At the jury trial held from May 15-17, 1990, Wines was tried on all counts. Only Johnson's claim for racially motivated harassment and intimidation, however, was tried against Hugo's, after the district court granted Hugo's motion for directed verdict on the other two counts. On May 17, 1990, the jury returned a verdict against Wines for the deprivation of Johnson's civil rights, assault and battery, and false arrest and imprisonment. The jury assessed against Wines damages in the amount of $200.00 compensatory and $500.00 punitive damages. The jury returned a verdict against Hugo's for racially motivated harassment and intimidation and assessed against it damages in the amount of $25,000.00 compensatory and $175,000.00 punitive damages.
 
 
 20
 On May 29, 1990, Johnson filed an application for $113,469.50 in attorney's fees and $1,308.63 in expenses. On July 13, 1990, Johnson filed an amended application for attorney's fees and expenses, requesting an additional $21,454.05 in attorney's fees and $1,744.85 in expenses. By Order dated October 25, 1990, the district court awarded Johnson $15,000 in attorney's fees and $654.32 in costs. The decision set forth in that Order was made after consideration of Johnson's first application only. On November 9, 1990, Johnson filed a supplemental application for attorney's fees and expenses requesting an additional $23,085.00 in attorney's fees and $496.25 in expenses incurred from July 14, 1990 to November 9, 1990. Johnson's amended application and supplemental application have not yet been ruled upon by the district court.
 
 
 21
 On June 1, 1990, Hugo's filed a motion for judgment n.o.v., new trial, or remittitur. On August 9, 1990, the Commonwealth of Virginia moved, after notification by the district court, pursuant to 28 U.S.C. § 2403(b), for permission to intervene as a party to the action and to be heard on the issue of the constitutionality of the punitive damage provisions of section 8.01-42.1 of the Virginia Code, and therewith submitted a memorandum in support of the statute. The Commonwealth's motion was granted by the district court by Order dated October 3, 1990. The district court thereafter denied each of Hugo's June 1, 1990 motions by Order dated October 11, 1990.
 
 
 22
 On November 9, 1990, Hugo's filed a notice of appeal from the district court's Order of October 11, 1990. On November 13, 1990, Hugo's filed an amended notice of appeal in order also to appeal from the underlying judgment. On November 21, 1990, Johnson filed a notice of cross-appeal for the district court's limited award of attorney's fees and expenses. The Commonwealth of Virginia remains in the action as an appellee on brief in support of the constitutionality of the punitive damage award entered pursuant to section 8.01-42.1 of the Virginia Code.
 
 II.
 
 23
 A. Evidence in Support of Racial Harassment and Intimidation
 
 
 24
 Hugo's first attacks the sufficiency of the evidence to support the jury's finding that Johnson was racially intimidated or harassed in violation of section 8.01-42.1 of the Virginia Code.
 
 
 25
 At trial, after the jury had entered its verdict, Hugo's moved for judgment n.o.v. or, in the alternative, for a new trial, asserting, inter alia, its sufficiency argument. We review the district court's denial of the motion for judgment n.o.v. by viewing all of the evidence in a light most favorable to Johnson, drawing all reasonable inferences in Johnson's favor, and then determining whether a reasonable jury could have found a verdict in Johnson's favor. Foster v. Tandy Corp., 828 F.2d 1052, 1055 (4th Cir.1987). The standard calls for "substantial evidence." Gairola v. Virginia Dept. of Gen. Servs., 753 F.2d 1281, 1285 (4th Cir.1985). A "scintilla of evidence" is not sufficient. Austin v. Torrington Co., 810 F.2d 416, 420 (4th Cir.1987). The appellate court is expressly prohibited from weighing the evidence or assessing the credibility of the witnesses. Taylor v. Home Ins. Co., 777 F.2d 849, 854 (4th Cir.1985). Alternatively, the district court's denial of the motion for a new trial is reviewed under an abuse of discretion standard. Willis v. Raymark Indus., Inc., 905 F.2d 793, 798 (4th Cir.1990).
 
 
 26
 Section 8.01-42.1 of the Virginia Code provides, in pertinent part,
 
 
 27
 Civil action for racial, religious, or ethnic harassment, violence or vandalism.--A. An action for injunctive relief or civil damages, or both, shall lie for any person who is subjected to acts of (i) intimidation or harassment or (ii) violence directed against his person; or (iii) vandalism directed against his real or personal property, where such acts are motivated by racial, religious, or ethnic animosity.
 
 
 28
 B. Any aggrieved party who initiates and prevails in an action authorized by this section shall be entitled to damages, including punitive damages, and in the discretion of the court to an award of the cost of the litigation and reasonable attorneys' fees in an amount to be fixed by the court.
 
 
 29
 The question, then, is whether there exists in the record substantial evidence that Hugo's intimidated or harassed Johnson and that such behavior was racially motivated.
 
 
 30
 Hugo's has attempted to prevail on its sufficiency argument by directing our attention to discrete, isolated portions of testimony in the record, testimony which, of itself, might in fact retain its probative force were it not susceptible to a far different interpretation in a broader context. For example, Hugo's has insisted that Johnson was not singled out for harassment because there existed evidence showing that Johnson was indeed skating dangerously and that it was a common practice of the skateway to eject patrons--black and white--who failed to conform to safety regulations.
 
 
 31
 As to the intimidation claim, Hugo's has asked how a 30 year-old, well-built, athletic man could possibly be intimidated by Wright, the manager, an older, slightly-built gentleman who never intimated in any way that he might subject Johnson to physical harm.
 
 
 32
 Finally, regarding the element of racial animus, Hugo's has insisted that the skateway's owner, Stribling, who ultimately called officer Wines to the scene, demonstrated no racial animosity towards Johnson, and indeed barely spoke to him that evening. Hugo's has further asserted that all of the testimony adduced at trial consistently demonstrated that no one had ever witnessed racial discrimination at the skateway.
 
 
 33
 Looking at the evidence objectively, however, and viewing the events of the evening of February 17, 1989 in their fuller context, we find more than substantial evidence of intimidation, harassment, and racial animus.
 
 
 34
 Other than one of the skateway's employees, Johnson was the only black in an otherwise totally white skating rink. Although there is conflicting testimony as to Johnson's unsafe skating, evidence also was adduced that other patrons were skating in an unsafe manner that evening. Nevertheless, without prior warning,[1] and within an hour of the rink's closing, Johnson was waved off the floor by Wright and was told, with little elaboration, "They want to see you in the back room." Johnson offered to leave, stating that he would willingly do so if that was what the skateway wanted. Rather than responding, Wright simply returned to the office. Finally, with only one half hour remaining until closing, Stribling summoned the sheriff's department without any further attempt to speak to Johnson or to warn him that his conduct had prompted her to place the call.
 
 
 35
 Johnson himself testified at trial that he felt intimidated, not only by his brief discussion with Wright, but by the circumstances surrounding his being accosted: the proximity to closing time, the lack of other black patrons, the lack of any other warnings, and Wright's refusal to elaborate upon the business of the "back room." While Johnson's testimony might be viewed as self-serving in isolation, the jury was free to weigh it in light of all of the other testimony adduced.
 
 
 36
 Finally, Hugo's contention that there existed no substantial evidence of racial animus does not hold water. One night after the incident, Stribling told a skateway employee, Crawford, that the rink had had trouble with a "nigger" (Johnson) the night before and that Crawford should be watchful for his return. Other testimony revealed that Stribling frequently expressed her distaste for interracial couples, asking co-workers, concerning other skateway customers, if they had seen "that hussie with that nigger." Admission of the 1979 consent decree revealed that Hugo's was not abiding by its terms by posting signs assuring equal access to its facilities, nor instructing its employees to make the facilities equally available to all persons regardless of race.
 
 
 37
 In the face of such strong evidence, the district court did not err in denying Hugo's motion for judgment n.o.v., nor did it abuse its discretion in denying the alternative motion for a new trial.
 
 
 38
 B. Admission of the Consent Decree Into Evidence
 
 
 39
 Hugo's next has challenged the district court's admission into evidence of the 1979 consent decree, claiming that the admission violated Federal Rules of Evidence 408, 404(b), and 403. We review admissions of evidence under an abuse of discretion "amounting to manifest error" standard. Fiberglass Insulators, Inc. v. Dupuy, 856 F.2d 652, 654-55 (4th Cir.1988).
 
 
 40
 One day prior to trial, Hugo's filed a motion in limine objecting to Johnson's intention to introduce the consent decree into evidence on the grounds stated above. The district court initially granted the motion, but with leave to Johnson to establish noncompliance with the decree through testimony sufficient to place the admission within the exception set forth in Federal Rule of Evidence 408 and to show that the probative value of admitting the decree would outweigh any prejudicial effect. Fed.R.Evid. 403.
 
 
 41
 At the close of plaintiff's evidence, and in light of the evidence of racial animus discussed in part II.A., supra, the district court admitted the consent decree into evidence, "for the sole purpose of any bearing it may have, if any, on the motive or intent with respect to the acts that are in issue in [the] suit." A limiting instruction to that effect was submitted to the jury. Presumably, the decree was admitted because the district court found that the Rule 408 exception had been satisfied and that the decree's evidence of motive or intent outweighed its prejudicial effect under Rule 403.
 
 
 42
 Rule 408 provides,
 
 
 43
 Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible.... This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.
 
 
 44
 It is to be noted at the outset that the decree clearly was not admitted to prove the truth of the matters which had been compromised upon; that is, to prove that Hugo's did indeed discriminate against blacks. The only remaining question, then, is whether the decree was properly admitted to show that failure to conform with the decree's sign and instruction provisions was probative evidence of motive or intent sufficient to fit within the Rule's exception.
 
 
 45
 The two authorities cited by Hugo in support of its contention that the admission of the decree violated Rule 408 are of little help because neither case has anything to do with the Rule. Greycas, Inc. v. Proud, 826 F.2d 1560, 1567 (7th Cir.1987) (hearsay rules exclude prior civil judgments as evidence of the facts underlying the judgment); Cinema Serv. Corp. v. Twentieth Century-Fox Film Corp., 477 F.Supp. 174, 178 (W.D.Pa.1979) (prior consent decree excluded because "well settled" doctrine makes civil consent judgments not admissible in treble damage, anti-trust actions; such evidence serves no purpose but prejudice).
 
 
 46
 More helpful is United States v. Gilbert, 668 F.2d 94, 97 (2d Cir.1981), cert. denied, 456 U.S. 946, 102 S.Ct. 2014, 72 L.Ed.2d 469 (1982), in which the Second Circuit affirmed the district court's admission of a civil consent decree under Rule 408 and Rule 404(b) to show that the defendant knew of the SEC reporting requirements involved in the decree, especially where the decree's prejudicial potential was not great and the district judge properly had cautioned the jury as to the limited inferences they could permissibly draw therefrom. See also Catullo v. Metzner, 834 F.2d 1075, 1079 (1st Cir.1987) (testimony concerning terms of settlement agreement was admissible to show that co-owner breached fiduciary duty in contravention of court-approved settlement). The district court's actions here seem to fall squarely within the ambit of those latter authorities.
 
 
 47
 For similar reasons, the admission of the consent decree was not violative of Rule 404(b). That rule provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed.R.Evid. 404(b) (emphasis added). Hugo's has attempted to argue against admission under Rule 404(b) by flatly stating that the decree was offered as evidence of Hugo's alleged propensity to discriminate against blacks. As discussed above, however, the record clearly demonstrates that the district court admitted the decree for the limited purpose of serving as probative evidence of intent or motive racially to discriminate by showing that Hugo's, contrary to its consent decree obligations, failed to post signs or instruct employees concerning the skateway's pledge of equal access. The court gave a limiting instruction to the jury to that effect, rendering the admission a proper exercise of discretion. See CFTC v. Co Petro Marketing Group, Inc., 680 F.2d 573, 584 (9th Cir.1982) (admission of 10 year-old consent decrees proper under Rule 404(b) to show defendant's familiarity with commodities laws and to rebut defendant's contention that Co Petro's actions were, at worst, innocent, technical violations); Gilbert, 668 F.2d at 97; Commonwealth v. Porter, 659 F.2d 306, 320 (3d Cir.1981) (admission of past civil rights violations of police officer proper under Rule 404(b)).
 
 
 48
 The only remaining evidentiary issue, and perhaps the most problematic of the three, is whether or not the probative value of the consent decree's requirements for posting the signs and instructing the staff outweighed any prejudicial effect brought about by allowing the jury to see a document which had clearly found Hugo's guilty of race discrimination. Fed.R.Evid. 403.
 
 
 49
 Here, the weakness of Hugo's argument that there is a dearth of evidence in the record supporting inferences of racial animus outside of the consent decree comes back to haunt it, because Hugo again relies on the assertion to contend that Johnson failed to lay any kind of foundation to justify the admission of the decree itself. As previously discussed, the argument is meritless, so meritless in fact that even if the district court had ruled the consent decree inadmissible, a reasonable jury still could have found racial animus on the basis of the other evidence adduced at trial. The district court did not abuse its discretion in ruling that the probative value of admitting the consent decree outweighed any prejudicial effect. The denial of Hugo's motion for a new trial on that basis was therefore proper.
 
 
 50
 C. Disproportionality of Compensatory Damages
 
 
 51
 Turning next to the jury's rather sizeable award of compensatory[2] damages against Hugo's, the skateway has contended that the district court erred in declining to grant a new trial on the ground of excessiveness, urging that the awards against Wines and Hugo's were disproportionate to their relative fault and suggesting that the jury's award against Hugo's was influenced by passion and prejudice engendered by the district court's admission of the consent decree.
 
 
 52
 Under the traditional law of the Fourth Circuit, a compensatory damage award will not be set aside on grounds of excessiveness unless it is against the clear weight of the evidence, is the product of erroneously admitted evidence, or will result in a miscarriage of justice. Spell v. McDaniel, 824 F.2d 1380, 1400 (4th Cir.1987). An assessment of damages is excessive in civil rights actions only when it is "outrageous" or "monstrous." Id. at 1400.
 
 
 53
 Clearly, there is a notable disproportionality of the compensatory damage verdicts handed down against Wines and Hugo's--$200 against Wines, $25,000 against Hugo's--especially when viewed in light of the degree of physical harm to Johnson inflicted by Wines. Hugo's has urged that the only possible explanation for the disparity is that the acts of Wines inflamed the passions and biases of the jury to the point that the jury punished Hugo's for Wines' behavior.
 
 
 54
 Equally notable, however, is the fact that Wines was not found culpable for racial harassment or intimidation. In its order denying Hugo's motions for judgment n.o.v. and for a new trial, the district court opined that the jury simply could have chosen to view the racial harassment and intimidation as the most heinous offense and assessed damages accordingly. Although the damage award is clearly large, we are of the opinion that none of the "excessiveness" factors set forth in Spell are present here, and thus conclude that the district court did not abuse its discretion in denying Hugo's motion for a new trial or remittitur on the basis of excessiveness of the compensatory damages.
 
 
 55
 D. Due Process Challenge to Award of Punitive Damages
 
 
 56
 In a second line of attack on the award of damages against it, Hugo's has asserted that the punitive damage award is violative of its due process rights because the jury had almost unbounded discretion in formulating the amount of the award. The attack centers not on the propriety of some punitive damages, but on the amount thereof. That some punitive damages properly could have been awarded by the jury seems evident from the facts disclosed by the record.
 
 
 57
 To consider the validity of the claim as to the amount of punitive damages, we begin our analysis with the Supreme Court's
 
 
 58
 longawaited pronouncement on the compatibility of state schemes allowing awards of punitive damages with the Due Process Clause of the Fourteenth Amendment, recently handed down in Pacific Mut. Life Ins. Co. v. Haslip, --- U.S. ----, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). Writing for a five-justice majority,[3] Justice Blackmun began by noting that
 
 
 59
 [o]ne must concede that unlimited jury discretion--or unlimited judicial discretion for that matter--in the fixing of punitive damages may invite extreme results that jar one's constitutional sensibilities. We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case. We can say, however, that general concerns of reasonableness and adequate guidance from the court when the case is tried to a jury properly enter into the constitutional calculus. With these concerns in mind, we review the constitutionality of the punitive damages awarded in this case.
 
 
 60
 Id. 111 S.Ct. at 1043 (citation and footnote omitted). Justice Blackmun then identified three factors which convinced the Court that Alabama juries did not have boundless discretion to award punitive damages.
 
 
 61
 First, the jury instruction informed the jury of the purposes of punitive damages, confining such purposes to deterrence and retribution, and explained that the award of punitive damages was not compulsory. Second, prior to the time that Haslip's case was tried, the Alabama Supreme Court had established post-trial procedures for scrutinizing punitive awards, requiring that trial courts " 'reflect in the record the reasons for interfering with a jury verdict, or refusing to do so, on grounds of excessiveness of the damages[,]' " and listing factors appropriate for the trial court's consideration of the decision to interfere. Id. at 1044 (quoting Hammond v. City of Gadsden, 493 So.2d 1374, 1379 (Ala.1986)). Third, the Alabama Supreme Court had developed substantive appellate review standards for determining whether a punitive award is reasonably related to the goals of deterrence or retribution.
 
 
 62
 Satisfied that the net effect of those procedural safeguards was to provide a sufficient check on the ability of Alabama juries to award punitive damages indiscriminately, the Haslip majority concluded by noting that "[w]hile punitive damages in Alabama may embrace such factors as the heinousness of the civil wrong, its effect upon the victim, the likelihood of its recurrence, and the extent of the defendant's wrongful gain, the fact finder must be guided by more than the defendant's net worth. Alabama plaintiffs do not enjoy a windfall because they have the good fortune to have a defendant with a deep pocket." Id. 111 S.Ct. at 1045.
 
 
 63
 Before turning to the instant case, we must note that nothing in Haslip defines the role of the lower federal courts in applying the standards enunciated therein. Indeed, as the Eleventh Circuit recently noted in American Employers Ins. Co. v. Southern Seeding Servs., Inc., 931 F.2d 1453 (11th Cir.1991), the proper role of the federal courts in assessing punitive damage awards under state law was set forth in the Supreme Court's earlier decision in Browning-Ferris Indus., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989). There the Court stated,
 
 
 64
 In reviewing an award of punitive damages, the role of the District Court is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered. The Court of Appeals should then review the District Court's determination under an abuse of discretion standard.
 
 
 65
 Id. at 279, 109 S.Ct. at 2922. The Court immediately went on to note that,
 
 
 66
 In performing the limited function of a federal appellate court, we perceive no federal common-law standard, or compelling federal policy, which convinces us that we should not continue to accord considerable deference to a district court's decision not to order a new trial. In this case the District Court properly instructed the jury on Vermont law and applied the proper state-law standard in considering whether the verdict was excessive.
 
 
 67
 Id. at 279-80, 109 S.Ct. at 2922-23 (emphasis added) (footnote and citation omitted). Reading Haslip and Browning-Ferris together, then, the issue before us is whether the federal scheme for reviewing punitive damage awards based on state statutes and state common law met muster. In other words, does a scheme comprising 1) the district court's jury instruction on punitive damages and the law of Virginia which determines its contours, 2) Virginia's current "excessiveness" standard applied by district courts in the Fourth Circuit for post-trial review of punitive damage awards under Rule 59 and the Commonwealth's legislative cap on punitive damages, and 3) the Fourth Circuit's abuse of discretion standard for review of Rule 59 dispositions, constitute a federal scheme sufficiently analogous to the state scheme upheld in Haslip to satisfy the requirements of due process? Whether the federal scheme of awarding punitive damages flowing from a state statute passes constitutional muster is a question of law entitled to de novo review. See, e.g., Garraghty v. Jordan, 830 F.2d 1295, 1289 (4th Cir.1987) (applying de novo review to procedural due process claim for which plaintiff sought directed verdict).
 
 
 68
 To address adequately and fully that issue, our analytical task here is threefold. First, we must determine whether the jury instruction satisfies Virginia's standards (as to conduct ) for an award of some punitive damages. Failure to pass this test would lead to upset of the punitive damages award. Here the propriety of some punitive damages clearly is established. Second, we must compare the post-trial and appellate review criteria currently set forth in the state law of Virginia and the federal law of the Fourth Circuit with the post-trial and appellate review criteria upheld in Haslip to determine the reasonableness of the amount.
 
 
 69
 If we determine that the review criteria set forth in the current federal scheme (i.e., the "excessiveness" standard) falls short of the minimum criteria necessary under Haslip, we must move to the third step and we must apply the more stringent federal criteria to determine if the punitive damages returned in Johnson's favor are "reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition." Haslip, 111 S.Ct. at 1045.[4]
 
 
 70
 Applying our foregoing analysis to the instant case, we have little difficulty in finding that the jury instruction satisfies the requirements of Virginia law. The jury instruction clearly reflected that, in order to justify an award of punitive damages, Hugo's had to have "acted wantonly, oppressively or with such malice as to evince a spirit of malice or criminal indifference to civil obligations." Wallen v. Allen, 231 Va. 289, 297, 343 S.E.2d 73, 78 (1986). It noted that entitlement in Virginia to compensatory damages generally is a prerequisite to awarding punitive damages. O'Brien v. Snow, 215 Va. 403, 405, 210 S.E.2d 165, 167 (1974). The instruction further pointed out that punitive damages had to "be fixed with calm discretion and sound reason and must never be awarded or fixed in amount because of any sympathy or bias or prejudice with respect to any party to the case." Indeed, comparison of the instant instruction to the full text of the instruction at issue in Haslip, 111 S.Ct. at 1037 n. 1, reveals that the instant instruction clearly sets forth the purposes of punitive damages as framed in the Supreme Court's opinion.
 
 
 71
 That brings us next to a comparison of the Virginia "excessiveness" standard employed in post-trial and appellate review of punitive damage awards in the Fourth Circuit with the review standards established by the appellate courts of Alabama and upheld in Haslip. Under Alabama law, the factors to be considered in post-trial and appellate review, first established in Hammond and later refined in Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), and Central Alabama Elec. Coop. v. Tapley, 546 So.2d 371 (Ala.1989), are legion. Such factors include
 
 
 72
 (a) whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred; (b) the degree of reprehensibility of the defendant's conduct, the duration of that conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct; (c) the profitability to the defendant of the wrongful conduct and the desirability of removing that profit and of having the defendant also sustain a loss; (d) the "financial position" of the defendant; (e) all the costs of litigation; (f) the imposition of criminal sanctions on the defendant for its conduct, these to be taken in mitigation; and (g) the existence of other civil awards against the defendant for the same conduct, these also to be taken in mitigation.
 
 
 73
 Haslip, 111 S.Ct. at 1045.
 
 The Haslip Court noted in addition that
 
 74
 the Alabama Supreme Court provides an additional check on the jury's or trial court's discretion. It first undertakes a comparative analysis. It then applies the detailed substantive standards it has developed for evaluating punitive awards. In particular, it makes its review to ensure that the award does "not exceed an amount that will accomplish society's goals of punishment and deterrence." This appellate review makes certain that the punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition.
 
 
 75
 Id. (citations and footnote omitted). Finally, the Court noted that the substantive review standards employed
 
 
 76
 distinguished Alabama's system from the Vermont and Mississippi schemes about which Justices expressed concern in [Browning-Ferris ] and in Bankers Life & Casualty Co. v. Crenshaw, 486 U.S. 71, 108 S.Ct. 1645, 100 L.Ed.2d 62 (1988). In those respective schemes, an amount awarded would be set aside or modified only if it was "manifestly and grossly excessive," Pezzano v. Bonneau, 133 Vt. 88, 91, 329 A.2d 659, 661 (1974), or would be considered excessive when "it evinces passion, bias and prejudice on the part of the jury so as to shock the conscience," Bankers Life & Casualty Co. v. Crenshaw, 483 So.2d 254, 278 (Miss.1985).
 
 
 77
 Id. at n. 10.
 
 
 78
 As discussed in section III.C., supra, in Virginia, a punitive damage award is deemed "excessive" and deserving of the granting of a new trial nisi remittitur when "the amount is so excessive as to shock the conscience of the court, or to create the impression that the jury was influenced by passion or prejudice." The Gazette, Inc. v. Harris, 229 Va. 1, 325 S.E.2d 713, cert. denied, 472 U.S. 1032, 105 S.Ct. 3513, 87 L.Ed.2d 643 (1985). The Commonwealth also has enacted a statutory cap on punitive damages of $350,000. Va.Code Ann. § 8.01-38.1 (1991).[5] And although the statutory cap places a substantially low ceiling on punitive damage awards, we cannot say, in light of the factors approved in Haslip, that the mere existence of the cap will in every case insulate from attack a punitive damage award that is not rationally related to some punitive purpose.
 
 
 79
 There can be little doubt that the Virginia standard is far more analogous to the schemes rejected by the Haslip Court in footnote 10 than they are to the Alabama scheme. We are therefore left inevitably to conclude that in order to comport with the due process requirements of the Fifth Amendment, post-trial and appellate review of punitive damage awards in the federal courts of the Fourth Circuit, based upon state statutes and common law, can no longer be conducted under Virginia's "excessiveness" standard but must instead proceed under standards similar to those enunciated by the Alabama courts in Hammond, Green Oil, and Central Alabama. Therefore, remand is necessitated and if the district court decides to refer the matter of the amount of punitive damages to a jury there will be a retrial on that point.[6]
 
 
 80
 There then may remain the question of whether the instant record is sufficiently developed to allow the district court, itself, to apply those new review standards. We believe that it may be.[7] First, the record makes clear that the harm likely to result, and the harm that actually did result--blatant racial discrimination resulting in harassment and intimidation--is substantial, and that an award of $175,000 is reasonably related to the degree of that harm. Second, the conduct long endured as is shown by evidence of a ten-year-old consent decree, the requirements of which were not being followed for as long as any witness could remember. Third, the existence of profit which should be removed and a concomitant loss from such improper behavior is readily established by the record. Fourth, no evidence was introduced of any other civil or criminal penalty assessed against Hugo's Skateway--other than the award of attorneys' fees (which the trial court substantially limited, see part III., infra )--which would stand to mitigate the instant award of punitive damages.[8] Perhaps the district court, on remand, may conclude that the punitive damages entered against Hugo's Skateway were "reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition." Haslip, 111 S.Ct. at 1045.
 
 III.
 
 81
 On cross-appeal, Johnson has contested the district court's limitation of an attorney's fee award to $15,000 in the face of a $113,469 request. Awards of attorneys' fees under section 8.01-42.1 are upheld on appeal unless under all the facts and circumstances the award is "clearly wrong." Lea v. Cone Mills Corp., 467 F.2d 277, 279 (4th Cir.1972). Because the exercise of discretion in awarding attorneys' fees typically is based upon first-hand knowledge of the case and the factors bearing on the reasonableness of a fee, it will not be disturbed except in cases of manifest abuse. EEOC v. Nutri/System, Inc., 685 F.Supp. 568 (E.D.Va.1988).
 
 
 82
 Although Johnson's original claim brought common claims of a constitutional deprivation under section 1983, false arrest and false imprisonment, and violation of section 8.01-42.1 against both Wines and Hugo's, only the section 8.01-42.1 claim was tried against Hugo's Skateway after the district court granted Hugo's motion for a directed verdict on the other two counts at the close of all the evidence. Wines, on the other hand, had judgment entered against him on the section 1983 claim, the false arrest and false imprisonment claims, and on an assault and battery claim. Johnson did not prevail against Wines on the racial harassment claim. Apparently, Wines may have settled any fee claim against him for an unknown sum.
 
 
 83
 It seems then, at the outset, that Johnson seeks a double recovery of attorneys' fees for claims as to which he did not, in fact, prevail against Hugo's Skateway but as to which he did prevail against Wines. The record reveals that counsel for Johnson submitted billing sheets for the entire course of the litigation, making no distinction between actions pursued against Wines and those pursued against Hugo's Skateway. In addition, the request provided no offset for any attorneys' fees that might be recovered from Wines.
 
 
 84
 Apparently, counsel for Johnson has asked us to view its assertion of error as if Wines never existed. Counsel relies heavily on the Supreme Court's decision in Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), for the proposition that where a suit consists of related claims, a plaintiff who has won substantial relief should not have his attorneys' fee award reduced simply because the district court did not adopt each contention raised.
 
 
 85
 Yet Hensley is inapposite for the simple reason that Johnson did prevail in every one of his claims, but partly only against different defendants. Here Johnson is seeking reimbursement from Hugo's Skateway for prevailing on three out of four claims against Wines though not against Hugo's, possibly because Wines does not possess the means to pay the fees expended in prosecuting the three claims under which he was found liable.
 
 
 86
 The district court found the fee application to be "manifestly excessive," noting that the case was an uncomplicated assault action infected by racial animus, which should have taken no more than 200 hours of work rather than the 914.5 claimed by counsel for Johnson. The court further found that the application failed to take into consideration that Johnson prevailed on only one of his three claims against Hugo's Skateway (and necessarily failed to take into consideration that Johnson prevailed on three of his four claims against Wines) and failed to take into account Johnson's settlement with Wines.[9] It cannot be said that in consideration of such factors, the district court's fee award was "clearly wrong." See Cone Mills, 467 F.2d at 277, 279 (4th Cir.1972) (award of $10,000 for 515 hours of work claimed by twelve lawyers was not beyond district court's discretion in the circumstances).
 
 
 87
 Accordingly, the judgment of the district court is
 
 
 88
 AFFIRMED except for the judgment as to the amount of the punitive award, which is REMANDED to the district court for reconsideration in the light of this opinion.
 
 
 89
 NIEMEYER, Circuit Judge, concurring and dissenting:
 
 
 90
 The jury in this case was instructed by the district court that the jury is permitted to award punitive damages to punish and to deter when defendant's conduct is "maliciously or wantonly or oppressively done." J.A. 400. As to the amount, the complete instruction directed: "you may add to the award of actual damages such amount as you shall unanimously agree to be proper as punitive or exemplary damages." Id. (emphasis added). No guidance as to the amount was provided. As is standard in instructing a jury, the jury was admonished that when deliberating it must fix the amount "with calm discretion and sound reason" and never out of "sympathy or bias or prejudice." J.A. 402. The jury awarded $175,000 in punitive damages.
 
 
 91
 Without any standard given to the jury to guide it in fixing the amount of punitive damages, the trial judge could not conclude that the jury was wrong in making the award. If the trial judge felt that the award was an improper one, the only reason could be that his judgment about the award was different from that of the jury. Yet, when the award of punitive damages is committed to the jury, as it unquestionably is, see Defender Indus., Inc. v. Northwestern Mut. Life Ins. Co., 938 F.2d 502, 505 (4th Cir.1991) (en banc), a judge may not substitute his judgment for that of the jury. Accordingly, the district judge in this case had no basis on which to review the punitive damages award, and the award was left standing as the subjective will of the jury.
 
 
 92
 The scheme for awarding punitive damages in this case (which includes the instructions to the jury and the post-verdict review by the court) amounted to a direction to the jury to award what it thought was "proper," without any standard by which to make the determination. Any award thus made, regardless of the amount, denied the defendant due process in violation of the Fifth Amendment. See Mattison v. Dallas Carrier Corp., 947 F.2d 95 (4th Cir.1991) (South Carolina scheme leaving broad discretion to jury in awarding punitive damages denied defendant due process).
 
 
 93
 The majority opinion apparently agrees that the instructions given in this case, which faithfully followed Virginia law, and the review by the court under traditional Rule 59 jurisprudence constitute a scheme that falls afoul of the Fifth Amendment. It concludes, at page 1351, supra:
 
 
 94
 [W]e are therefore left inevitably to conclude that in order to comport with the due process requirements of the Fifth Amendment, post-trial and appellate review of punitive damage awards in the federal courts of the Fourth Circuit, based upon state statutes, can no longer be conducted under the "excessiveness" standard [of Shamblin's Ready Mix, Inc. v. Eaton Corp., 873 F.2d 736 (4th Cir.1989) and Spell v. McDaniel, 824 F.2d 1380 (4th Cir.1987) ] but must instead proceed under standards similar to those enunciated by the Alabama courts in Hammond, Green Oil, and Central Alabama [as referred to by the Supreme Court in Pacific Mut. Life Ins. Co. v. Haslip, --- U.S. ----, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) ].
 
 
 95
 To cure the problem, however, the majority discards the existing Rule 59 jurisprudence and adopts "new review procedures" as used in Alabama to be used hereafter by federal courts in this Circuit, even while recognizing that the Alabama post-verdict review process is a de novo process that anticipates the court's consideration of facts and matters not before the jury. That sweeping act disposes of two hundred years of jurisprudence in the federal courts for reviewing jury verdicts, see Mattison, 947 F.2d at 110-112, and directly conflicts with our recent en banc decision in Defender Indus., 938 F.2d at 505 (holding that a jury assessment of the amount of punitive damages "is an inherent and fundamental right" guaranteed by the Seventh Amendment). More importantly, the "new review procedures" that are advanced by the majority opinion violate the express limitations of the Seventh Amendment which must apply to every federal district court sitting in a diversity case. The Seventh Amendment demands that "no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII. And the common law incorporated into the Seventh Amendment does not permit a court to substitute its judgment for that of a jury in weighing the facts. Mattison, 947 F.2d at 111. Moreover, it does not permit, as Alabama apparently allows, a judge to consider facts and other matters not before the jury when reviewing a matter committed to the jury. Id.
 
 
 96
 For reasons that we develop more fully in Mattison, I would find that the law that was applied in this case for awarding punitive damages denied the defendant due process in violation of the Fifth Amendment, and therefore cannot stand.
 
 
 97
 I respectfully dissent from the majority opinion insofar as it affirms the award of punitive damages and concur with the remainder.
 
 
 
 [1]
 Testimony showed that skaters routinely were given three warnings before being asked to leave the rink
 
 
 [2]
 Because we believe, as we shall discuss at length in part II.D., infra, that, in the wake of the Supreme Court's opinion in Pacific Mut. Life Ins. Co. v. Haslip, --- U.S. ----, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), the "excessiveness" standard can no longer be the federal standard of review for awards of punitive damages based on state law, we limit our discussion here to the compensatory damage award returned against Hugo's
 
 
 [3]
 Justice Scalia and Justice Kennedy wrote concurring opinions. Justice O'Connor dissented. Justice Souter took no part in the decision
 
 
 [4]
 The net result of this analysis in a sense departs, insofar as the exact issues involved, from Haslip in two respects. First, it will be based upon the Due Process Clause of the Fifth Amendment, not the Due Process Clause of the Fourteenth Amendment. In either event, however, the constitutional standard in the present case should be the same. See, e.g., Hameetman v. City of Chicago, 776 F.2d 636 (7th Cir.1985) (principles of federalism require that Fourteenth Amendment due process clause not be interpreted to place more stringent procedural constraints on state agencies than the same language in the Fifth Amendment places on federal agencies). We are thus disinclined to view Haslip as a ruling solely confined to state law applied in a state court proceeding whose due process standards are ones which we are in the present case, tried in federal court, consequently free to adopt or reject. To adopt such a restricted view would encourage plaintiffs to forum shop with the knowledge that a punitive damages claim based on state law might face a less constitutionally stringent review process if brought in federal court
 Second, because the instant litigation has not reached, and might reach, the final stage of appeal, i.e., the Supreme Court, any due process defects in the review of the award still could and should be cured, by adopting and applying, if necessary, a review standard based upon the "reasonableness" factors of Haslip.
 
 
 [5]
 The cap is applicable to any action accruing on or after July 1, 1988 and thus served as a ceiling for the punitive damages in the instant case
 
 
 [6]
 Although there is some uncertainty as to whether, to meet constitutional muster, each and every Haslip factor must be satisfied, we find ourselves in accord with the analysis that the Fifth Circuit conducted in its recent opinion in Eichenseer v. Reserve Life Ins. Co., 934 F.2d 1377 (5th Cir.1991), finding sufficient evidence in the record to satisfy three of the seven Haslip factors and thus finding that "the record in th[e] case provide[d] sufficient support for an award of punitive damages." Id. at 1384. We recognize that the district court in Eichenseer, as in the instant case, did not have the benefit of Haslip before it. Nevertheless, the district court, if it should choose the option of reviewing the amount of the punitive award under the Haslip standards, on remand may find sufficient evidence in the record to support application of enough of the Haslip factors, which, in the end, would render the punitive damages award within the confines of due process, dispensing with the necessity of a new trial as to the amount of punitive damages
 We find misfounded concerns about the Seventh Amendment if such review is conducted by the district court. As in Eichenseer, the district judge simply would be conducting a narrow review based upon the evidence in the record. We are not in the case of such a review asking the district judge to consider factors that were not before the jury. Rather, we are simply suggesting that the district judge review the jury's factual determination to draw a legal conclusion (i.e., the reasonableness of the punitive damages award). See, e.g. Grunenthal v. Long Island R.R. Co., 393 U.S. 156, 89 S.Ct. 331, 21 L.Ed.2d 309 (1968). Accordingly, this narrow review does not run afoul of the Seventh Amendment.
 Assuming, without deciding, that district courts which now have the benefit of Haslip should use a jury instruction very like the one adopted in Mattison v. Dallas Carrier Court, 947 F.2d 95, (4th Cir.1991), nothing compels such a result since jury instructions must be shaped in accordance with state law and, as the majority in Mattison points out, of courts in the Fourth Circuit only the Supreme Court of South Carolina has found the jury instruction adequate under Haslip. It may well be that in future cases, sufficient evidence will not be available in the record to support a punitive damages award in light of Haslip. In those cases, a new trial will have to be awarded and the district court may utilize an instruction similar to the one in Mattison. But it must be remembered that the jury verdict in Hugo's Skateway preceded Haslip.
 
 
 [7]
 Rather than ourselves conduct the Haslip-like post-verdict review, we have chosen to remand the case to the district court for jury retrial as to the amount of punitive damages unless the district court is satisfied that there has been sufficient compliance with Haslip. Then, if either party brings an appeal from such reconsideration, we would review the district court's decision under an abuse of discretion standard
 
 
 [8]
 Financial position or worth was not considered in Haslip. See 111 S.Ct. at 1037, 1044
 
 
 [9]
 Counsel for Johnson makes much of the fact that the district court erroneously observed that both Hugo's Skateway and Wines were found liable on the racial harassment and intimidation count and that the fee application should have taken that fact into account
 Even though the court was incorrect in its observation, the conclusion still holds up: Johnson proceeded against Wines and Hugo's from a common nucleus of operative facts, prevailed against Wines on three of four claims, prevailed against Hugo's Skateway on one of three claims, and yet seeks to assess all of the fees against Hugo's.